**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| BURGESS BIOPOWER, LLC, *et al.*[1] | Case No. 24-10235 (LSS) |
| | (Joint Administration Requested) |
| Debtors. | |

**DECLARATION OF DEAN VOMERO PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Dean Vomero, of full age, hereby declare as follows:

1.      I am the Chief Restructuring Officer of Berlin Station, LLC ("Berlin Station") and Burgess BioPower, LLC ("Burgess BioPower"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases"). I am also the Founding Member and Managing Director of Applied Business Strategy LLC ("Applied Business"). The Debtors engaged Applied Business, effective October 27, 2023, to provide turnaround management and contingency-planning advisory services, and I was appointed to be the Chief Restructuring Officer of the Debtors effective October 27, 2023. I am authorized by the Debtors to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

2.      I have over thirty years of executive management, restructuring, financial advisory, forecasting, strategy and business valuation experience spanning several industries, including consumer products, food and beverage, financial services, automotive, retail, metals, general manufacturing and energy. My restructuring experience includes operating and managing

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Burgess BioPower, LLC (0971) and Berlin Station, LLC (1913). The Debtors' corporate headquarters are located at c/o CS Operations, Inc., 631 US Hwy 1, #300, North Palm Beach, FL 33408.

businesses in and out of court, conducting and managing sales and liquidations of assets and business interests, advising boards of directors on restructuring issues, assisting in litigation, negotiating settlements, and administering claims-payment structures in a variety of matters. I have served as a Chief Restructuring Officer or interim executive officer in many instances.

3.      I hold a Bachelor of Science in Business Administration in Accounting from John Carroll University. I am also a Certified Public Accountant (inactive status) and a Certified Professional Forecaster. I have lectured on turnaround and restructuring topics and have authored published articles concerning turnaround and restructuring topics.

4.      As the Debtors' Chief Restructuring Officer, I have been responsible for overseeing the Debtors' preparations for the Chapter 11 Cases and their business plans since Applied Business was engaged. I have further familiarized myself with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team. Except as otherwise stated in the First Day Declaration, the statements set forth herein are based on (i) my personal knowledge or opinion derived from my experience and knowledge as a restructuring professional, (ii) information that I received from the Debtors' management or the Debtors' professionals working directly with me or under my supervision, direction or control, or from the various advisors of the Debtors, and/or (iii) my review of relevant documents. If called upon, I would testify competently to the facts set forth in the First Day Declaration.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court") and filed various pleadings described herein requesting certain relief in connection with

the Chapter 11 Cases (collectively, the "First Day Pleadings").  The Debtors will continue to operate their business and manage their properties as debtors in possession.

6.      I submit the First Day Declaration on behalf of the Debtors in support of the Chapter 11 Cases and the First Day Pleadings.  As explained in more detail herein, the Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business.  I have reviewed the Debtors' voluntary petitions for relief and the First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully preserve and maximize the value of the Debtors' estates.

7.      Part I of the First Day Declaration provides an overview of the Debtors' business. Part II summarizes the Debtors' organizational structure, prepetition capital structure and indebtedness, and business operations.  Part III discusses the circumstances leading to the Debtors' commencement of the Chapter 11 Cases.  Part IV outlines the objectives of the Chapter 11 Cases and the means for implementing those objectives.  Part V sets forth certain facts in support of the First Day Pleadings.

## I.

## OVERVIEW OF THE DEBTORS' BUSINESS

8.      The Debtors comprise renewable energy power companies that own and operate a 75-megawatt biomass-fueled power plant (the "Facility") located on an approximately 62-acre site in Berlin, New Hampshire (the "Facility Site").  Berlin Station owns the Facility and the Facility Site, and Burgess BioPower leases the Facility pursuant to a long-term lease described in more detail below.  Burgess BioPower also holds the necessary regulatory licenses for the operation of the Facility.

9.      The Facility consistently ranks among the most efficient and well-run biomass plants in the country.  The Facility's capacity factor, which is a measurement of run time and efficiency, has historically averaged over 90 percent, and generally exceeds the industry average of around 58.1 percent.  Each year, the Facility undergoes a comprehensive third-party evaluation of its management and operations.  Those reports have repeatedly confirmed that the Facility's management team performs well above industry norms.

10.      The Debtors deliver more than 500,000 megawatt hours of sustainable and reliable baseload power to the New England power grid on an annual basis.  The Facility is the fourth largest power generator in New Hampshire and is the only power generator of those four that uses regionally sourced fuel.  500,000 megawatt hours of energy is enough to power 67,000 homes, or about 10% of New Hampshire's total homes.

11.      The Facility is also an important part of the renewable energy resource portfolio in New England.  It presently helps New Hampshire achieve the statutory mandates set forth in the renewable portfolio standards, NH RSA § 362-F, which require that approximately 25 percent of the state's electricity come from renewable resources.  Additionally, the Facility contributes over $2 million annually directly to the City of Berlin through taxes, fees and revenue sharing.

12.      The Debtors are responsible for generating $70 million in annual economic activity in New Hampshire, including in the areas of forestry management, outdoor recreation and timber production.  Approximately 28 individuals work at the Facility, which directly or indirectly provides over 240 jobs, mostly in Coos County, New Hampshire, and is responsible for more than $15 million in labor income on an annual basis.

13.      The Debtors are the largest buyer of biomass in New Hampshire, buying approximately 800,000 tons of low-grade wood each year from over 115 New Hampshire suppliers

across the state, including loggers, sawmills, municipal transfer stations and tree services.[2]  This low-grade wood, also known as biomass, is a residual material created as a byproduct of timber harvesting, lumber production, municipal waste and sawmill operating.  As the largest single buyer of biomass in the state, the Debtors provide a critical public service by efficiently utilizing an otherwise unusable – and potentially dangerous – material.  For example, if residual material is left on the forest floor to decompose, it creates combustion risk as it dries.  Without an outlet to manage mill waste, sawmills cannot operate, or they must landfill waste creating environmental liability.

14.    Berlin Station's predecessor acquired the Facility Site in 2008 for approximately $100 million.  At that time, the Facility Site housed a pulp and paper mill, shuttered in 2006 after a long decline in the region's paper industry.  The Facility was converted to power generation production between 2011 and 2013 by Berlin Station and became operational on November 25, 2013.

15.    As described in further detail below, in September 2011, the Debtors closed on $275 million of financing – including approximately $200 million for construction and equipment costs – to retrofit the former paper mill and construct an innovative, environmentally-friendly biomass power plant.  The Facility was retrofitted into a renewable energy facility between 2011 and 2013 using state of the art technology to convert it into its current operations.  The Facility produces electricity by blowing air and shooting biomass fuel[3] through hot bubbling beds of sand.

---

[2] The Debtors build an inventory of fuel during the winter because loggers cannot efficiently harvest trees in the early spring due to the wet and muddy ground conditions.

[3] Biomass fuel is a renewable, organic material that comes from plants and animals.  The Facility uses woody biomass, which refers to untreated, plant-derived materials such as brush, stumps, lumber ends and trimmings, wood pallets, bark, wood chips or pellets, shavings, sawdust and slash,

As the biomass fuel burns, steam is created to turn a 75-megawatt turbine, generating electricity. The electricity generated by the Facility is delivered to the New England power grid via an interconnection site located in Berlin, New Hampshire.

16.     While the Debtors are directly and indirectly responsible for creating numerous jobs in Berlin, structurally they do not have any employees and do not operate or manage the Facility on a day-to-day basis.  Instead, the Debtors contract with CS Operations, Inc. ("CS Operations") and CS Berlin Ops, Inc. ("CS Berlin Ops"), non-debtor affiliates, for the supply of personnel and services needed to operate and maintain the Facility, produce and sell energy and other products the Facility generates, manage the Facility and the Facility Site, collect revenue, provide back office and overhead support, and otherwise manage and run the Debtors' business.

17.     The Facility has been running for over a decade, supplying power to Public Service Company of New Hampshire, doing business as Eversource Energy ("Eversource") pursuant to that certain Power Purchase Agreement entered into by and between Berlin Station and Eversource, dated as of May 18, 2011, and amended on November 19, 2019, and on August 18, 2022 (as amended, the "PPA").  As discussed herein, prior to the Petition Date, Eversource materially breached the PPA by improperly withholding more than $3.6 million from the Debtors, essentially cutting off nearly all of the Debtors' revenue while continuing to consume all of the Debtors' power.  The Debtors provided Eversource with a notice of breach and an opportunity to cure pursuant to the terms of the PPA, but Eversource refused to do so.  Accordingly, the Debtors terminated the PPA.  They now seek to sell – and be paid for – their power through other channels

---

and agricultural crops.  One benefit of the Facility's using woody biomass fuel is that such fuel has limited other uses due to its low-grade quality.

while commencing the Chapter 11 Cases to effect an orderly restructuring for the benefit of its stakeholders.

## II.

## PREPETITION CAPITAL STRUCTURE AND BUSINESS OPERATIONS

### A. Prepetition Capital Structure

***Ownership Structure***

18.     The ownership of the Debtors is reflected in the Organizational Chart attached hereto as Exhibit A.

19.     Berlin Station was formed on March 1, 2011, as a limited liability company organized under the laws of the State of Delaware.  Berlin Station is directly owned by two single purpose entities, BBP #1, LLC (99%) and BBP #2, LLC (1%) (collectively, the "Members").  Berlin Station is managed by a board of directors consisting of six directors, three of whom were designated by the Members and three of whom are independent directors.  Of the three independent directors, two are deemed "independent company directors" as such term is defined in that certain Limited Liability Company Agreement of Berlin Station dated as of September 2, 2011, as it may be amended or restated from time to time.  The third independent director was appointed recently, specifically for his restructuring and energy experience.  Consent of the independent company directors is required for Berlin Station to undertake certain significant corporate events, including filing for bankruptcy relief.

20.     Burgess BioPower was formed on March 1, 2011, as a limited liability company organized under the laws of the State of Delaware.  Burgess BioPower is a wholly-owned direct subsidiary of Burgess Holding, LLC ("Burgess Holding"), a single purpose entity.  Burgess BioPower is managed by a board of directors consisting of six directors, three of whom were

designated by Burgess Holding and three of whom are independent directors. Of the three independent directors, two are deemed "independent company directors" as such term is defined in that certain Limited Liability Agreement of Burgess BioPower dated as of September 2, 2011, as it may be amended or restated from time to time. The two independent company directors of Burgess BioPower are different individuals than the two independent company directors of Berlin Station. The third independent director is the same as that for Berlin Station, selected for his energy expertise. Consent of the independent company directors is required for Burgess BioPower to undertake certain significant corporate events, including filing for bankruptcy relief.

21.     Each of the Debtors have formed a special committee comprised of the independent directors from the applicable Debtors' boards of directors for approving any transactions that might involve a non-Debtor affiliated entity.

22.     Burgess Holding and BBP #1 are themselves owned by a single purpose entity known as NewCo Energy Holdings LLC. This entity has no business of its own other than its second-tier ownership of the Debtors.

### *Debt Structure*

#### a. **Senior Secured Debt**

23.     In September 2011, the Debtors closed on senior secured debt financing in the amount of $200 million consisting of three tranches of *pari passu* debt. In connection with this financing, the Debtors and their lenders entered in the following agreements: (i) that certain Note Purchase Agreement dated as of September 2, 2011 entered into by and between Berlin Station and the Senior Secured Noteholders (as defined below) (as amended, the "<u>Senior Note Purchase</u>

Agreement");[4] (ii) that certain Depositary and Security Agreement entered into by and between Burgess BioPower and DBTCA Trust Company Americas, in its capacity as Collateral Agent ("DBTCA"), and dated as of September 2, 2011 (as amended, the "Burgess BioPower Depositary and Security Agreement");[5] (iii) that certain Depositary and Security Agreement entered into by and between Berlin Station and DBTCA and dated as of September 2, 2011 (the "Berlin Station Depositary and Security Agreement"); (iv) that certain First Mortgage with Assignment of Leases, Contracts and Rents, and Fixture Filing entered into by and between Berlin Station and DBTCA (the "First Mortgage") dated as of September 2, 2011; (v) that certain Pledge and Security Agreement entered into by and between the Members and DBTCA, and dated as of September 2, 2011 (the "Berlin Station Pledge Agreement"); (vi) that certain Pledge and Security Agreement entered into by and between Burgess Holding and DBTCA, and dated as of September 2, 2011 (the "Burgess BioPower Pledge Agreement");   (vii) that certain Security Agreement dated September 2, 2011 entered into by and between Berlin Station and DBTCA (as amended, the "Berlin Station Security Agreement");[6] and (h) that certain Security Agreement dated as of

---

[4] The Prepetition Senior Secured NPA has been amended on six (6) separate occasions by (a) that certain Consent and Amendment dated as of October 25, 2012; (b) that certain Amendment No. 2 to the Note Purchase Agreement dated as of March 30, 2015; (c) that certain Amendment No. 1 to Amended and Restated Depositary and Security Agreement dated as of March 30, 2015; (d) that certain Amendment No. 1 to Depositary and Security Agreement dated March 30, 2015; (e) that certain Waiver, Consent and Amendment dated April 11, 2016; and (f) that certain Waiver, Consent and Amendment dated March 17, 2017

[5] The Burgess BioPower Depositary and Security Agreement was amended by that certain Consent, Amendment No. 2 to Note Purchase Agreement, Amendment No. 1 to Depositary and Security Agreement and Amendment No. 1 to Depositary and Security Agreement dated March 30, 2015.

[6] The Berlin Station Security Agreement was amended by that certain Amended and Restated Security Agreement dated as of October 25, 2012.

September 2, 2011 by and between Berlin Station and Burgess BioPower (the "Burgess BioPower Security Agreement," and together with the Senior Note Purchase Agreement, the Burgess BioPower Depositary and Security Agreement, the Berlin Station Depositary and Security Agreement, the First Mortgage, the Berlin Station Pledge Agreement, the Burgess BioPower Pledge Agreement, and the Berlin Station Security Agreement, the "Senior Note Documents").

24.     Under the Senior Note Documents, Berlin Station issued 7.00% Senior Secured Series A Fixed Rate Notes in an aggregate principal amount of $57 million which mature on September 30, 2031 (the "Series A Notes"), 7.50% Senior Secured Series B Fixed Rate Notes in an aggregate principal amount of $93 million which mature on September 30, 2031 (the "Series B Notes"), and Senior Secured Floating Rate Notes in an aggregate principal amount of $50 million which matured on September 30, 2022 (the "Floating Rate Notes," and together with the Series A Notes and the Series B Notes, the "Senior Notes").  As of the Petition Date, approximately $115.0 million remains outstanding on the Senior Notes, which reflects a paydown of approximately $85.0 million, excluding interest, fees, costs and expenses.

25.     The Senior Notes were originally issued and continue to be held by a group of insurance companies including The Prudential Insurance Company of America, Pruco Life Insurance Company, Prudential Legacy Insurance Company of New Jersey, Pacific Life Insurance Company, Pacific Life & Annuity Company, Aviva Life and Annuity Company and Royal Neighbors of America (collectively, the "Senior Secured Noteholders").  The Senior Notes are secured by a continuing lien and security interest on (i) all current and subsequently acquired real and personal property of the Debtors, including the Facility, the Facility Site, the Debtors' cash flows, the Debtors' bank accounts, the Debtors' receivables and the Debtors' inventory (the "Assets"); and (ii) all limited liability company interests of the Debtors (the "Pledged Interests,"

and together with the Assets, the "Senior Debt Collateral").  The Senior Note Documents exclude certain assets from the Senior Debt Collateral, including (i) the cash grant in lieu of electricity production credits under Section 45 of the Internal Revenue Code, 26 U.S.C. §§ 1 *et seq.*, issued by the U.S. Department of Treasury under Section 1603 of the American Recovery and Reinvestment Act of 2009, resulting from the Debtors' investment into the Facility (the "Section 1603 Grant"); (ii) the right to receive proceeds from the Section 1603 Grant; (iii) the Section 1603 Grant application and any proceeds of such application; (iv) any tax credits or tax attributes of any kind relating to the 1603 Grant; (v) any required approval which by its terms or by operation of law would become void, voidable, terminable or revocable or would constitute a breach of default thereunder if a security interest therein was granted; or (vi) any lease, license, contract or agreement to which Berlin Station is a party, or any of its rights or interests thereunder, if and for so long as the grant of such lien or security interest shall result in the unenforceability of any right therein or a breach thereof.

26.    DBTCA, in its capacity as Collateral Agent for the Senior Secured Noteholders, filed a UCC financing statement in New Hampshire on September 2, 2011 to perfect the lien on the Senior Debt Collateral of Berlin Station (the "Initial NH Berlin Financing Statement"). DBTCA thereafter amended the Initial NH Berlin Financing Statement on October 31, 2012, and filed a continuation thereof on September 1, 2016.  On September 16, 2021, DBTCA refiled the Initial NH Berlin Financing Statement in New Hampshire.

27.    DBTCA filed a UCC financing statement in Delaware on the Senior Debt Collateral of Berlin Station on September 10, 2021 (the "Initial DE Berlin Financing Statement").  DBTCA thereafter amended the Initial DE Berlin Financing Statement on May 31, 2022.

28.     DBTCA has not made any financing statement filings against Burgess BioPower related to the Senior Notes.

29.     The Debtors notified the Senior Secured Noteholders of certain occurrences and continuing defaults and events of default under the Senior Note Documents pursuant to that certain Waiver, Consent and Amendment dated as of April 11, 2016, and that certain Waiver, Consent and Amendment dated as of March 17, 2017, each by and between Berlin Station, Burgess BioPower, DBTCA and the Senior Secured Noteholders (collectively, the "Waivers").  Pursuant to the Waivers, the Senior Secured Noteholders waived each of the then-existing defaults and consented to extending certain payable obligations through fiscal year 2018.  The Debtors are currently in default under the Senior Note Documents.

**b. Subordinated Secured Debt**

30.     In addition to the Senior Notes, Berlin Station issued subordinated secured debt in the principal amount of approximately $74,734,671 to finance the construction and development of the Facility and certain related expenses (the "Subordinated Debt") pursuant to the CDE Subordinated Loan Agreement and the Greenline Subordinated Loan Agreement (each as defined below, and together the "Subordinated Loan Agreements").  Approximately $29.7 million remains outstanding in the aggregate on account of the Subordinated Debt.

31.     CDE Subordinated Loan Agreement.  Pursuant to that certain CDE Subordinated Loan Agreement made by and between Berlin Station; CCM Community Development XIX LLC, a Delaware limited liability company ("CCM"); RBC Community Development Sub 6, LLC, a Delaware limited liability company ("RBC"); Empowerment Reinvestment Fund XV, LLC, a Delaware limited liability company ("ERF"); NHBFA Sub-CDE II, LLC, a New Hampshire limited liability company ("NHBFA") and CTA CDE Sub 4, LLC, a Florida limited liability

company ("CTA," and together with CCM, RBC, ERF and NHBFA, the "CDE Subordinated Lenders"), dated as of September 2, 2011 (the "CDE Subordinated Loan Agreement"), the CDE Subordinated Lenders extended a loan in the aggregate principal amount of $63,552,071 to Berlin Station to finance the construction and development of the Facility and certain related expenses, with a maturity date of September 1, 2033. The obligations under the CDE Subordinated Loan are secured by liens on all of Berlin Station's right, title and interest in and to the Facility. The CDE Subordinated Lenders assigned their rights and obligations to the notes under the CDE Subordinated Loan Agreement to Berlin BioPower Investment Fund, LLC, a Missouri limited liability company and nondebtor affiliate of the Debtors, in accordance with those certain Alonges to Notes dated September 5, 2018 (collectively, the "QLICI Berlin Bio Investment Notes"). As of the Petition Date, approximately $16.3 million remains outstanding on the QLICI Berlin Bio Investment Notes.

32.    **Greenline Subordinated Loan Agreement.** Pursuant to the Subordinated Loan Agreement by and between Greenline CDF Subfund XVIII LLC ("Greenline," and together with the CDE Subordinated Lenders, the "Subordinated Lenders"), a Delaware limited liability company, as lender, and Berlin Station, as borrower, dated as of October 25, 2012 (the "Greenline Subordinated Loan Agreement"), Greenline extended a loan in the aggregate principal amount of $11,182,600 to Berlin Station to finance the construction and development of the Facility, to repay certain outstanding obligations and to pay certain transaction costs and expenses, as reflected by those certain Notes issued by Berlin Station with a maturity date of October 25, 2023 (the "Greenline Notes"). The Greenline Notes are payable semi-annually on the 15th of every July and January, and have an interest rate of 1.262190%. The obligations under the Greenline Subordinated Loan Agreement and the Greenline Notes are secured by liens on all of Berlin

Station's right, title and interest in and to the Facility.  As of the Petition Date, approximately $13.4 million remains outstanding on the Greenline Notes.  Pursuant to the Amended and Restated Subordination and Intercreditor Agreement dated as of October 25, 2012, Greenline's security interest in the collateral is subordinated to the CDE Subordinated Lenders' security interest in the collateral.

33.    DBTCA, in its capacity as Collateral Agent for the Subordinated Lenders, filed an amendment to the Initial NH Berlin Financing Statement in New Hampshire on October 31, 2012 to perfect the security interest in the assets of Berlin Station made pursuant to the Subordinated Debt, which was continued on September 1, 2016.  DBTCA then filed an updated UCC financing statement in New Hampshire related to the Subordinated Debt on September 16, 2021.  DBTCA also filed an amendment to the Initial DE Berlin Financing Statement in Delaware on May 31, 2022 in the assets of Berlin Station made pursuant to the Subordinated Debt.  DBTCA has not made any financing statement filings against Burgess BioPower related to the Subordinated Loan Agreements.

34.    DBTCA    filed    the    following    mortgages    against    the    real    estate    of Berlin Station: (i) First Mortgage with Assignment of Leases, Contracts and Rents, and Fixture Filing from Berlin Station, LLC to the Collateral Agent, dated September 2, 2011, recorded in Book 1333, Page 949 in the Coos County Registry of Deeds (the "Senior Mortgage") for the benefit of the Senior Secured Noteholders; (ii) Second Mortgage with Assignment of Leases, Contracts and Rents, and Fixture Filing from Berlin Station, LLC to the Collateral Agent, dated September 2, 2011, recorded in Book 1333, Page 976 in the Coos County Registry of Deeds (the "Second Mortgage") for the benefit of the Subordinated Lenders and subject to the Subordination and Attornment Agreement dated as of September 2, 2011; and (c) Third Mortgage with

Assignment of Leases, Contracts and Rents and Fixture Filing from Berlin Station, LLC to the Collateral Agent, dated October 25, 2012, recorded in Book 1362, Page 672 in the Coos County Registry of Deeds for the benefit of the Subordinated Lenders (the "Third Mortgage," and together with the Senior Mortgage and the Second Mortgage, the "DB Mortgages").

35.    The rights and privileges with respect to the Senior Secured Noteholders and the Subordinated Lenders are set forth in that certain Collateral Agency, Subordination, and Intercreditor Agreement dated September 2, 2011, as amended by that certain Amended and Restated Collateral Agency, Subordination and Intercreditor Agreement dated as of October 25, 2012 (as amended, the "Prepetition Collateral Agency Agreement"), entered into by and among Berlin Station, DBTCA, in its capacity as Collateral Agent for the Senior Secured Noteholders and the Subordinated Lenders and as Depositary under the Senior Note Purchase Agreement.  Pursuant to the Prepetition Collateral Agency Agreement, the Senior Secured Noteholders retain a first lien over any shared collateral securing the payment and performance of the obligations under the Senior Loan Documents, and the Subordinated Lenders retain a second lien over any shared collateral securing the payment and performance of the obligations under the Subordinated Loan Agreements.  The Prepetition Collateral Agency Agreement provides that the liens on any shared collateral are separate and distinct, and must be separately classified in any plan of reorganization proposed or adopted in any insolvency proceeding.   Additionally, the Prepetition Collateral Agency Agreement grants the exclusive right to enforce or exercise rights and remedies related to the collateral to DBTCA, in its capacity as Collateral Agent for the Senior Secured Noteholders and the Subordinated Lenders, without any consultation or consent of the Subordinated Lenders.

### c. **Berlin Station's UCC Financing Statement**

36.     Pursuant to that certain Lessee Security Agreement dated as of September 2, 2011 (the "Lessee Security Agreement") between Berlin Station and Burgess BioPower, Berlin Station filed a UCC financing statement in Delaware in all of the assets of Burgess BioPower, except those excluded by the Lessee Security Agreement, on September 10, 2021.

### d. **Unsecured Debt**

37.     In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business, the O&M Agreement (as defined below) and the PMA (as defined below).  The entirety of the trade obligations are incurred by Burgess BioPower, not Berlin Station, and Burgess BioPower is generally current with its trade obligations.  The Debtors may have other potential and contingent liabilities related to litigation and regulatory obligations.  As of the Petition Date, the Debtors believe that they have only a small amount of unsecured debt, other than possible critical vendor claims, which they are seeking authority to pay in full through the Critical Vendors Motion (as defined below).

38.     Invoices for goods or services provided to the Debtors are typically directed to Burgess BioPower.  Payment is typically arranged by CS Operations pursuant to its management responsibilities under the PMA, and all payments are made in the ordinary course of business.

### B. **Business Operations**

39.     The Debtors generate power, deliver it to the grid, and manage their operations pursuant to several executory contracts, including the material contracts described below.

### *PPA*

40.     The Debtors' revenue streams historically derived primarily from the PPA with Eversource.  The term of the PPA was twenty (20) years, running from the date the Facility went

into service on November 25, 2013 (the "In-Service Date") to November 25, 2033.  PPA at § 2.1.

The PPA was approved by the New Hampshire Public Utilities Commission (the "NHPUC") on

or about April 18, 2011.

41.    The PPA generally required the Debtors[7] to sell and Eversource to purchase 100%

of the Facility's energy, capacity and ancillary services, and most renewable energy certificates

produced by the Facility (collectively, "Products") at agreed prices throughout the term of the

PPA.  More specifically, under the PPA, the Debtors sold and Eversource purchased three different

categories of Products, as follows:

a.    **ENERGY.**  The PPA required the Debtors to sell and deliver to Eversource, and

Eversource to purchase, 100% of energy produced by the Facility (which is all Products other than

Capacity and RECs (as those terms are defined herein)) ("Energy") at a variable price equal to

$69.80 per megawatt hour adjusted for variation of biomass fuel costs, and referred to as the

"Adjusted Base Price" in the PPA.  *Id.* at §§ 5.1, 5.5, 6.1.2(a).  For all Energy sold to Eversource

in excess of 500,000 megawatt hours in any given Operating Year (as defined below), the parties

calculated an invoice adjustment based on the difference between the Adjusted Base Price and a

contractually defined reference price for energy.  *Id.* at § 6.1.3.  That invoice adjustment was then

applied to invoices as either a credit or a charge to Eversource, depending upon whether the value

of the invoice adjustment is negative (credit to Eversource) or positive (charge to Eversource).  *Id.*

The Debtors refer to this invoice adjustment as "Excess Energy."

---

[7] By way of that certain Right to Use Agreement (the "Right to Use Agreement") and the BBP-BS Lease (as defined below), each executed between Burgess BioPower and Berlin Station on September 2, 2011, Burgess BioPower assumed the "rights to exercise day-to-day operational control over, and manage, the Project, including control over sales of the electrical output (electric energy, capacity and ancillary services) of [Berlin Station]."  BBP-BS Lease at § 6.1.  Accordingly, I refer informally to the obligations of Berlin Station under the PPA as performed by Burgess BioPower as obligations of the Debtors.

b. **CAPACITY.** The PPA required the Debtors to sell and deliver, and Eversource to purchase, all "Capacity" (as that term is defined in the PPA)[8] at stipulated rates. *Id.* at §§ 5.1, 5.5, 6.1.2(b). Eversource initially paid the Debtors $2.95 per kilowatt month of Capacity sold. *Id.* at § 6.1.2(b). From 2015 to 2018, Eversource paid $4.25 per kilowatt month of Capacity sold. *Id.* For each year after 2018, the price per kilowatt month of Capacity sold increased by $0.15 per kilowatt month. *Id.*

c. **RECs.** The PPA required the Debtors to sell to Eversource, and Eversource to purchase, renewable energy certificates ("RECs") produced by the Facility.[9] *Id.* at §§ 5.1, 5.5, 6.1.2(c). The PPA required Eversource to purchase 400,000 RECs and allowed RECs generated in excess of that amount to be sold by the Debtors to third parties. *Id.* at §§ 6.1.2(c), 6.1.3. The cost per REC is a function of the number of RECs delivered during the period and the alternative compliance payment schedule set forth under NH RSA § 362-F. *Id.* at § 6.1.2(c).

42. The PPA required that, no later than five business days following the end of each calendar month, Eversource was to read the Facility's meters, calculate a monthly invoice for Energy and Capacity generated during the preceding calendar month, and provide this information

---

[8] "Capacity" refers to the "MWs of capacity that (i) has obtained a capacity supply obligation as a result of participation and clearing in an ISO-NE administered forward capacity auction, reconfiguration capacity auction or any successor or other capacity supply auction, marketplace, or agreement and, (ii) as such, is receiving compensation pursuant to this capacity supply obligation by ISO-NE via the ISO-NE settlement process governed by the ISO-NE Documents." PPA at § 1.9. Under the PPA, Eversource was designated as the Debtors' agent for purposes of participating in the capacity auction administered by ISO New England ("ISO-NE"), the regional operator for New England's electric grid administered, and Eversource was obligated to participate in the capacity auction on the Debtors' behalf. ISO-NE conducts capacity auctions on an annual basis, with the latest such auction ending on February 7, 2024.

[9] RECs are produced by the Facility pursuant to its qualification as a renewable energy source under New Hampshire's Class I Renewable Statutes, NH RSA § 362-F. A REC, and its associated attributes and benefits, can be sold, allowing the buyer of a REC to claim to have purchased renewable energy and to balance its portfolio to meet statutory requirements.

to Berlin Station (which is undertaken by Burgess BioPower pursuant to the Right to Use Agreement) within ten days of such reading. *Id.* at § 10.2. Burgess BioPower then was to return an approved invoice to Eversource for payment, and Eversource was to make payment to Burgess BioPower electronically for the total amount due within twenty-three (23) days of the meter reading date or ten (10) days of Burgess BioPower's return of the approved invoice to Eversource, whichever was later. *Id.* Historically, Eversource's payment to Burgess BioPower for the Energy and Capacity produced by the Facility in a given month occurred on or around the 23rd day of the successive month. The RECs were invoiced and paid on a different schedule. Eversource's payments for the RECs were due shortly after delivery of the RECs into the PSNH NEPOOL GIS (as that term is defined in the PPA) account. *Id.* at § 6.1.2(c). Burgess BioPower was typically paid for RECs produced by the Facility on a quarterly basis. All payments made by Eversource under the PPA were deposited into Burgess BioPower's bank accounts.

43. The PPA contained a one-way price ratchet that, prior to termination of the PPA, benefitted only Eversource: the cumulative reduction factor (the "CRF"). The CRF references two prices: (i) the Adjusted Base Price, which, as explained above, is the variable price that Eversource paid the Debtors for Energy provided to Eversource under the PPA, and (ii) a reference price called the "ISO-NE Energy Price," which refers to the day-ahead price for the submarket where the Facility is located and is administered by ISO-NE. *Id.* at §§ 1.2, 1.35, 6.1.4(a). Under the PPA's CRF provisions, when the Adjusted Base Price for Energy exceeded the ISO-NE Energy Price, a negative adjustment was made; and when the Adjusted Base Price was less than the ISO-NE Energy Price, a positive adjustment was made. *Id.* at § 6.1.4(a). The CRF was calculated on an hourly basis. *Id.* The cumulative value of these adjustments was referred to as the "Cumulative Factor," and a net negative Cumulative Factor was referred to as the "Cumulative Reduction." *Id.*

44.    The CRF was calculated "for the purpose of adjusting the price of any Facility purchase option by" Eversource pursuant to the PPA and the Option Agreement (as defined below).  The PPA provided that a "Cumulative Reduction will serve to reduce the purchase price of the Facility as provided in the … Option Agreement.  A net positive Cumulative Factor will bestow no rights or obligations on either Party to this Agreement."  *Id.* at § 6.1.4(a).

45.    The Facility's "operating year" runs from December 1 to November 30 of the following year ("Operating Year").  *Id.* at § 1.49.  If, at the end of any Operating Year of the PPA's term, the Cumulative Reduction exceeded $100 million, the PPA purported to allow Eversource to credit the excess against payments for Energy (but not any other Products) delivered in the subsequent Operating Year in one-twelfth increments each month.  *Id.* at § 6.1.4(c).

46.    The Cumulative Reduction reached $100 million in the Facility's sixth year of operations, on or about September 4, 2019.  Due to several legislative and regulatory actions (as described further herein), enforcement of the PPA's CRF provisions was suspended through the Operating Year ending November 30, 2023.

47.    Prior to termination, the PPA contained a right of first refusal and purchase option for Eversource.  Under the right of first refusal, in the event Berlin Station submitted or obtained a bona fide offer of purchase to or from a third party, Berlin Station would have been required to make that offer available to Eversource on terms and conditions no less favorable.  *Id.* at § 7.1. Under the purchase option, Eversource had an option that, even absent termination for breach, would not have matured until November 25, 2033, to purchase the Facility and the Facility Site during the 120-day period following the expiration of the PPA on that same date. *Id.* at § 7.2.  The PPA included a form option agreement as Appendix B.  In connection with and as required by the PPA, Eversource and the Debtors entered into that certain Purchase Option Agreement (the

"Option Agreement"), dated as of November 25, 2013, which is the In-Service Date.  The Option Agreement was filed with the Coos County Registry of Deeds.

48.     Under that certain Subordination Agreement dated as of November 19, 2013, DBTCA purportedly subordinated the DB Mortgages, including all mortgage interests, security interests and other liens of DBTCA, for the benefit of the Senior Secured Noteholders and the Subordinated Lenders, to the terms and conditions of the Option Agreement and that certain Agreement Creating Easement Over Property of Berlin Station, dated as of November 25, 2013 (the "Eversource-DB Agreement").  The Eversource-DB Agreement was filed with the Coos County Registry of Deeds.

49.     As described further herein, on February 8, 2024, prior to the petition being filed, the Debtors terminated the PPA and the Option Agreement due to Eversource's material breach of the PPA.

### Sale of RECs

50.     The quarterly REC payments under the PPA were a significant source of revenue for the Debtors.  The Debtors also occasionally sell RECs to other parties on the spot REC market, primarily through commodity brokers specializing in environmental attribute products ("Merchant REC Sales").  The ultimate buyers for the Debtors' Merchant REC Sales are retail energy suppliers looking to meet their voluntary and regulatory compliance obligations.  The Debtors work with these brokers to obtain multiple price quotes for the REC quantities available to trade and select the highest offer available.  Typically, the Debtors conduct Merchant REC Sales every month they are produced in a given contract year.

### The BBP-BS Lease

51.     Burgess BioPower leases the Facility and the Facility Site from Berlin Station pursuant to a September 2, 2011 Lease by and between the Debtors (the "BBP-BS Lease").  The term of the BBP-BS Lease is twenty-one (21) years following the In-Service Date of November 25, 2013, and thus is set to expire on November 25, 2034.  BBP-BS Lease at § 2.1.  Under the BBP-BS Lease, Burgess BioPower makes rent payments and annual supplemental rent payments to Berlin Station at stipulated rates provided therein.  *See id.* at Art. III.  Rent is typically paid quarterly.

52.     The BBP-BS Lease grants Burgess BioPower the right to exercise full day-to-day operational control over the Facility, including control over sales of Products generated by the Facility to Eversource under the PPA.  *Id.* at § 6.1.  The amounts paid by Eversource under the PPA were deposited into Burgess BioPower's bank accounts.  Burgess BioPower then used that cash to pay the operating expenses for the Facility and also used a portion to pay Berlin Station monthly rent and annual supplemental rent payments under the BBP-BS Lease.  Berlin Station in turn used the proceeds derived from the BBP-BS Lease to pay its interest-bearing debt and operating expenses.  The BBP-BS Lease is Berlin Station's only source of revenue.

### Service Agreements

53.     The Debtors do not have any direct employees and neither operate nor manage the Facility on a day-to-day basis.  Instead, the Debtors contract with their non-debtor affiliates CS Operations and CS Berlin Ops for the supply of personnel and services needed to operate and maintain the Facility.  As described below, CS Berlin Ops provides the services for the day-to-day operations of the Facility (including the employees running the Facility), and CS Operations provides all other services.

54.     Absent the contractual agreements with CS Operations and CS Berlin Ops, the Debtors would be incapable of operating and maintaining the Facility reliably and safely, and generating revenue, thereby diminishing the value of the Debtors' assets and introducing a variety of safety and other concerns.

55.     **The Operation and Maintenance Agreement.**  Pursuant to that certain Operation and Maintenance Agreement by and between Berlin Station and CS Berlin Ops, dated as of January 19, 2018 (as amended January 19, 2022, further amended December 1, 2023, and as amended from time to time, the "O&M Agreement"), CS Berlin Ops provides the operation, maintenance and technical support services necessary to operate the Facility and employs expert and trained individuals to work onsite at the Facility (the "Site Personnel").  Such services include (but are not limited to):

- Operating the Facility seven (7) days a week, twenty-four (24) hours per day, performing purchasing, operations and maintenance activities;

- Maintaining a health and safety program compliant with the Occupational Safety and Health Administration;

- Conducting internal assessments of programs and compliance for deficiencies and opportunities for safety improvements;

- Preparing emergency response plans and maintaining an emergency preparedness program;

- Training Site Personnel;

- Preparing and submitting generation and fuel consumption reports;

- Maintaining computer infrastructure, computer data and access security program; and

- Providing support to Berlin Station as reasonably requested.

O&M Agreement at Exhibit A.

56.     The obligations of Berlin Station under the O&M Agreement were assumed by Burgess BioPower pursuant to the Right to Use Agreement.  In exchange for the services provided by CS Berlin Ops, Burgess BioPower pays CS Berlin Ops (i) costs incurred by CS Berlin Ops in the ordinary course of business in the performance of services under the O&M Agreement (the "Operator Reimbursable Costs"); (ii) wages, salaries and payroll additives, including insurance, workers compensation and retirement payments owed to the Site Personnel (the "Payroll Costs"), which are typically around $0.5 million per month; (iii) a monthly fee of $0.024 million (the "Operating Fee");[10] and (iv) certain incentive bonuses as specified in the O&M Agreement (the "Incentive Payments," and together with the Operator Reimbursable Costs, the Payroll Costs, and the Operating Fee, the "O&M Service Fees").  *Id.* at § 4.1.

57.     Typically, on or prior to the tenth (10th) day of each month, CS Berlin Ops submits an invoice to Burgess BioPower for any of the O&M Service Fees incurred during the previous month, and each monthly invoice is paid within thirty (30) days or later of receipt of the invoice or the last business day of the then current month.  The Incentive Payments related to performance bonuses earned and payable for each calendar year are invoiced on or prior to the tenth (10th) day of April of the following calendar year.  *Id.* at § 4.2.  Accounting for the payments made by Burgess BioPower for the benefit of Berlin Station is captured through intercompany transactions. Payments (made from Burgess BioPower) approximate $0.65 million for Payroll Costs and Incentive Payments for the months of January and February 2024 and such payments already have been made prepetition to CS Berlin Ops.  As of the Petition Date, estimated amounts due and owing to CS Berlin Ops for greater than sixty (60) days of the Petition Date are approximately

---

[10] The Operating Fee is adjusted annually by an escalation rate based on the Consumer Price index, as published by the U.S. Department of Labor.

$0.2 million, which amounts may be subject to waiver under the terms of the RSA (as defined below).[11]

58.     CS Berlin Ops has the right to terminate the O&M Agreement if Berlin Station does not timely pay the O&M Service Fees within thirty (30) days of receiving a notice of default.  *Id.* at § 5.2.  The current term of the O&M Agreement is set to expire on January 19, 2025, at which point, the O&M Agreement automatically renews for an additional one-year period unless terminated upon at least ninety (90) days' notice.  *Id.* at § 5.1.

59.     **The Project Management Agreement.**  Berlin Station and Cate Street Capital, Inc. ("CSC") entered into that certain Project Management Agreement dated as of June 29, 2011 (as amended by the First Amendment dated February 8, 2024, the "PMA").  The obligations of Berlin Station under the PMA were assumed by Burgess Biopower pursuant to the Right to Use Agreement.  On March 1, 2018, CSC assigned the PMA to CS Operations, a non-debtor affiliate of the Debtors.  Pursuant to the PMA, CS Operations provides the Debtors with certain management services (the "Management Services").  The Management Services provided by CS Operations include (but are not limited to) the following:

- Providing executive management services;

- Preparing and distributing all financial statements, other financial reports, budgets, estimates, tax returns and other information required;

- Accounting, billing and other similar cash management services;

- Reviewing, analyzing and recommending action to Berlin Station regarding the obtaining, maintenance and renewal of all insurance required;

- Reviewing and analyzing Facility data regarding compliance of regulatory permits;

---

[11] The estimated amount owed to CS Berlin Ops may differ from what ultimately is owed because certain of the O&M Service Fees may not have been calculated or settled, and CS Berlin Ops may be entitled to calculate and settle such obligations in the ordinary course, which may give rise to prepetition amounts owing from the Debtors to CS Berlin Ops.

- Advising with respect to proposed modification, repair or replacement of the Facility;

- Assisting with the procurement and management of fuel for use at the Facility;

- Coordinating and overseeing payroll services; and

- Providing and coordinating public relations and regulatory affairs services.

PMA at Art. II.

60.     As compensation for the Management Services, Berlin Station is currently obligated to pay CS Operations $0.15 million per month for December 2023 through April 2024, $0.125 million per month for May 2024 through the earlier of consummation of a sale or a chapter 11 plan, and $0.092 million per month thereafter, subject to adjustment as set forth in the PMA (collectively, the "Manager Compensation").  *Id.* at § 3.1.  The Manager Compensation is paid monthly on the last day of the month for which payment is due.  *Id.* at § 3.2.

61.     The past amount owed to CS Operations pursuant to the PMA in the amount of $857,803.32 and, without duplication, any other fees, charges, claims or other amounts that have been incurred as of February 5, 2024, any accrued interest in respect of any past due amounts under the PMA, that, in each case, have not been paid by Berlin Station as of February 5, 2024, were forgiven under the PMA; *provided*, *however*, that the amounts of the Manager Compensation due and owing for the month of February 2024, and all other fees, expenses, charges, claims or other amounts that have been incurred since February 5, 2024 remain due.[12]

62.     The term of the PMA is twenty-one (21) years after the Commencement Date (as defined in the PMA), which aligns with the In-Service Date.  PMA at § 7.1.  CS Operations has

---

[12] Several current PMA Obligations may have not yet been calculated or settled, and CS Operations may be entitled to calculate and settle such obligations in the ordinary course, which may give rise to prepetition amounts owing from the Debtors to CS Operations.

the right to terminate the PMA if Burgess BioPower does not timely pay the Manager Compensation as it becomes due. *Id.* at § 6.3.

### *Fuel Supply Contract*

63.    Berlin Station's predecessor and Richard Carrier Trucking, Inc. ("Richard Carrier") entered into that certain Biomass Fuel Supply Agreement as of March 1, 2011 (the "Biomass Fuel Supply Agreement").   Pursuant to the Biomass Fuel Supply Agreement, Berlin Station, and therefore Burgess BioPower pursuant to the Right to Use Agreement, agreed to purchase all of the Facility's biomass fuel needs from Richard Carrier, provided that Richard Carrer can satisfy the Facility's monthly minimum requirements as specified in the Biomass Fuel Supply Agreement. Biomass Fuel Supply Agreement at §§ 1, 7.  The term of the Biomass Fuel Supply Agreement is twenty (20) years after the In-Service Date. *Id.* at § 3(b). Continuation of the Biomass Fuel Supply Agreement is important to the Debtors' ability to sell Products.

### *Interconnection Agreement*

64.    Berlin Station, ISO-NE and Northeast Utilities Service Company, on behalf of Eversource, entered into a Large Generator Interconnection Agreement, effective as of July 18, 2011 (the "LGIA").   The purpose of the LGIA is to enable the Facility to put power into the ISO-NE electric grid.   The term of the LGIA is 30 years, and the LGIA automatically renews for successive one-year periods thereafter.  LGIA at § 2.2.  Continuation of the LGIA is important to the Debtors' ability to sell electricity.

## III.

## KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

65.    The Debtors' ordinary-course operations have historically generated sufficient revenues to cover operating costs and to pay debt service.  Moving into 2024, however, the Debtors

faced significant constriction of their cash flows for at least two reasons.  As explained further herein, the legislative moratorium over the PPA's CRF provisions elapsed at the end of the last Operating Year, November 30, 2023, thereby permitting Eversource under the PPA to credit the amount in the CRF in excess of $100 million against payments for Energy delivered this Operating Year in one-twelfth (1/12) installments.  Given these actions by Eversource, had the PPA not been terminated, the Debtors would have been required to sell Energy to Eversource for free.

66.     Eversource further exacerbated the Debtors' precarious financial position when, on January 23, 2024, Eversource notified the Debtors that it would be improperly offsetting the excess amounts in the CRF against REC and Capacity payments due.  This action was directly contrary to representations that Eversource had provided both to the Debtors and the NHPUC in the preceding weeks that Eversource was not contractually entitled to offset excess amounts in the CRF against REC and Capacity payments.  This about-face by Eversource caused an immediate liquidity crisis for the Debtors.  Faced with sharply contracting revenue streams that were not sufficient to enable the Debtors to pay for operations or service their ongoing obligations, the Debtors were forced to commence the Chapter 11 Cases to effect an orderly restructuring.

67.     As explained above, the PPA purports to allow Eversource to credit certain payments for Energy delivered in the subsequent Operating Year to the extent the CRF exceeds $100 million at the end of the preceding Operating Year.  The CRF first reached $100 million in September 2019.  As a result of the threatened credit, on December 5, 2018, the NHPUC issued Order No. 26,198, which suspended operation of the PPA's CRF provisions for three years from the date on which the CRF reached $100 million.[13]  While Order No. 26,198 provided Berlin

---

[13] The NHPUC issued Order No. 26,198 pursuant to Senate Bill 577, signed into law by New Hampshire Governor Christopher Sununu on June 28, 2018.

Station with a moratorium of its obligations under the PPA's CRF provisions, the order also provided that the CRF would continue to accumulate during that moratorium. The NHPUC extended the moratorium to November 30, 2023, through Order No. 26,705. Further legislative enactments to fix the Debtors' CRF problem failed in the fall of 2023.

68.     The moratorium expired on December 1, 2023. Accordingly, beginning in January 2024 for Energy delivered in and after December 2023, the PPA purported to permit Eversource to credit in one-twelfth (1/12) installments the amounts in the CRF in excess of $100 million as of November 30, 2023. On December 8, 2023, Eversource notified the Debtors that, as of November 30, 2023, the CRF balance (adjusted for Excess Energy) was $171,542,675.07, or about $71.5 million above $100 million. Based on this, Eversource asserted that it was purportedly permitted under the PPA to credit approximately $5.96 million against payments due for Energy delivered in the current Operating Year from each of the Debtors' monthly invoices beginning in January 2024 – but not for any other payment obligations such as Capacity or RECs.

69.     Also in its December 8, 2023 notification, Eversource advised the Debtors that it was entitled to an Excess Energy credit in the amount of $213,828.44 for the first three invoices in Operating Year 11 (January 2024, February 2024, and March 2024). Eversource's December 8, 2023 notification is attached hereto as Exhibit B.

70.     While the PPA purported to allow Eversource to credit approximately $71.5 million against its payment obligations for Energy under the PPA in the current Operating Year, it did not permit Eversource to credit any amounts against its payment obligations for Capacity or RECs. Section 6.1.4(c) of the PPA is clear on this – Eversource is only entitled to credit Energy payments against the $71.5 million. In numerous written communications, Eversource acknowledged that the PPA did not permit Eversource to credit any amounts against its payment obligations for

Capacity or RECs.  For example, on or about January 8, 2024, Eversource submitted its January 2024 invoice for Energy and Capacity to the Debtors showing that a $5.96 million CRF credit would be credited against its Energy payment obligations only, not Capacity.  A copy of Eversource's January 8, 2024 invoice is attached hereto as <u>Exhibit C</u>.  On or about January 16, 2024, Eversource submitted a report to the NHPUC, in which it notified the NHPUC that Eversource "can only deduct repayment of the excess of the CRF from the revenue produced from Burgess' energy generation.  **The payments cannot be taken from capacity or REC revenue.**" (Emphasis added.)  A copy of Eversource's January 16, 2024 report to the NHPUC is attached hereto as <u>Exhibit D</u>.  On or about January 10, 2024, Eversource submitted an invoice to the Debtors showing that, on January 22, 2024, it would pay the entire REC payment due for the prior quarter. A copy of that invoice is attached hereto as <u>Exhibit E</u>.

71.    Despite all of these representations, Eversource did not pay the required RECs payment on January 22, 2024.  Rather, on or about January 23, 2024 (the date its payment obligations for Capacity and Energy were due to the Debtors), Eversource unilaterally "revised" its original January 2024 invoice to credit amounts owed pursuant to the PPA's CRF provisions against payments owed for RECs delivered in the third quarter of 2023 and current Capacity payments, which resulted in a dramatic reduction in payment to the Debtors.  As a result, instead of Eversource paying Debtors $5,487,826.88 on January 23, 2024, Eversource paid only $1,801,868.33, improperly withholding $3,685,958.55.  A copy of Eversource's revised January 23, 2024 invoice is attached hereto as <u>Exhibit F</u>.  The Debtors immediately sent Eversource a notice of breach of the PPA and provided it with an opportunity to cure in accordance with the terms of the PPA.  A copy of the Debtors' notice of breach is attached hereto as <u>Exhibit G</u>.

72.     On or about January 25, 2024, Eversource sent a letter to Debtors disputing that it had breached the PPA, notwithstanding its nonpayment to the Debtors for RECs delivered, instead arguing for the first time – and in contravention of its earlier representations – that the PPA permitted Eversource to credit amounts owed under the CRF against payments due for RECs delivered and current Capacity payments.  A copy of Eversource's January 25, 2024 letter is attached hereto as Exhibit H.  On or about February 2, 2024, Eversource purported to update its report to the NHPUC, informing that Eversource was now taking the position that the PPA allowed Eversource to "net the amount owed" pursuant to the PPA's CRF provisions against revenue Eversource owed the Debtors for Capacity and RECs.  A copy of Eversource's February 2, 2024 report to the NHPUC is attached hereto as Exhibit I.

73.     Eversource failed to cure its default within seven (7) business days, as required by the PPA.  PPA at § 12.1.1.  Accordingly, on February 5, 2024, the Debtors notified Eversource that the PPA did not confer any right upon Eversource to credit amounts owed under the CRF against payments due for RECs or Capacity delivered.  A copy of the Debtors' February 5, 2024 notice is attached hereto as Exhibit J.  Accordingly, pursuant to Section 12.2 of the PPA, Berlin Station terminated the PPA on February 8, 2024.  A copy of Berlin Station's February 8, 2024 notice of termination of the PPA is attached hereto as Exhibit K.  On the same date, subsequent to termination of the PPA, the Debtors terminated the Option Agreement, which they were contractually entitled to do under Section 2(a) of the Option Agreement.  A copy of the Debtors' February 8, 2024 notice of termination of the Option Agreement is attached hereto as Exhibit L.

74.     Eversource's non-payment and material breach of the PPA has placed the Debtors in an untenable financial position.  Since that time, the Debtors have received no revenue for their production of energy, and Eversource's actions have completely blocked the Debtors' ability to

enter into a new power purchase agreement with another party and/or to sell energy on a merchant basis, jeopardizing virtually all of the Debtors' revenue streams.  Furthermore, the Debtors will not be able to market their assets for a potential sale to a third party outside of bankruptcy given the overhang of Eversource's actions.

## IV.

### OVERVIEW OF THE PROPOSED RESTRUCTURING

75.     In the face of the challenges presented to the Debtors by the CRF, the Debtors engaged SSG Advisors LLC ("SSG Advisors"), Applied Business and Foley Hoag LLP to assist in analyzing the Debtors' financial position and to explore options to deleverage the Debtors' balance sheet.  Recognizing that an effective and efficient solution to the Debtors' financial concerns would require broad-based support from their various stakeholders, the Debtors, CS Operations, CS Berlin Ops, Jean Hallé ("Hallé") and the Senior Secured Noteholders worked together to develop a restructuring plan for the Chapter 11 Cases that would provide for the ongoing operations of the Debtors' enterprise, pay all trade creditors in full, preserve numerous jobs and provide a path to an exit that will continue to contribute to the economy of Berlin and New Hampshire for many years to come, as specified in more detail below.

76.     On February 8, 2024, the Debtors, the Senior Secured Noteholders, CS Operations, CS Berlin Ops, Jean Hallé ("Hallé"), the Members and Burgess Holding entered into that certain Restructuring Support Agreement attached hereto as Exhibit M (the "RSA").  The principal terms of the RSA are summarized below:

a.  The RSA incorporates by reference a Chapter 11 Plan (including any exhibits, annexes, supplements, schedules and attachments thereto in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and

in accordance with the RSA, the "Plan"), which contains as its key feature a "toggle."  The toggle envisions either a sale transaction under sections 363 and 1129 of the Bankruptcy Code or a debt-for-equity swap pursuant to which the Senior Secured Noteholders become the post-petition owners of the reorganized Debtors.  The Plan provides for payment in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, and any Allowed Secured Claims (as those terms are defined in the Plan).  In addition, unsecured creditors of Burgess BioPower would receive 100% of their Allowed Claims on the Effective Date (as those terms are defined in the Plan) up to a cap of $250,000.  Unsecured creditors of Berlin Station would receive no distribution on account of their Allowed Claims.

b.    The Debtors agree to implement their restructuring in accordance with certain milestones (the "Milestones") as set forth in the RSA.

c.  The Debtors, CS Operations and CS Berlin Ops agree to comply with certain obligations as set forth in the RSA, including using commercially reasonable efforts to pursue the Debtors' restructuring in accordance with the Milestones; using commercially reasonable efforts to obtain required regulatory approvals and provide required notices in connection with any sale and/or plan process; operating the Facility in the ordinary course of business in a reasonable manner that is consistent with the RSA and the Debtors' past practices; as to the Debtors, stipulating the allowance and amounts of claims of the Senior Secured Noteholders and the validity of liens such Senior Secured Noteholders hold in the Debtors' assets and timely filing a formal objection to any motion challenging the Senior Secured Noteholders' claims and/or the right of the Senior Secured Noteholders to receive or retain proceeds or distributions in any sale and/or plan process; and cooperating and consenting with the Senior Secured Noteholders with respect to

the development and adoption of the Debtors' business plan, including any business plan contemplated by the Plan. *See* RSA § 6.1.

      d.    The Senior Secured Noteholders agree to comply with certain obligations of the RSA, including using commercially reasonable efforts to support the Debtors' restructuring on the terms of the RSA; using commercially reasonable efforts to provide any information necessary to obtain required regulatory approvals and provide required notices in connection with any sale and/or plan process; and forbearing from exercising, directly or indirectly, any rights or remedies or from asserting or bringing any claims under or with respect to the Senior Note Documents against the Debtors or any of their respective assets, to the extent such exercise is consistent with the RSA. *Id.* at § 6.3.

      e.    Hallé agrees to comply with certain obligations of the RSA, including using commercially reasonable efforts to pursue the Debtors' restructuring on the terms of, and in accordance with the Milestones; not changing any material tax election, tax practice or procedure, or tax accounting method with respect to the Debtors; and not challenging the validity, enforceability, perfection or priority of, or seek avoidance, disallowance or subordination of, any portion of the Senior Secured Noteholders' claims or the liens securing such claims. *Id.* at § 6.4.

      f.    The RSA is terminable by the Senior Secured Noteholders under certain circumstances, including any breach of the RSA, or any obligation, representation, or warranty by the parties thereto; the issuance of any order or revocation of any license, qualification or permit, or denial of any approvals that would preclude the Debtors from operating the Facility, or that impairs the Facility and/or the BBP-BS Lease in connection with the Plan or the sale; the failure of the Debtors to meet any Milestone, which has not been waived or extended with the consent of the Senior Secured Noteholders; the rejection or termination of certain material agreements,

including the O&M Agreement, the PMA, the BBP-BS Lease, and the Biomass Supply Agreement; any material impact on any of the security agreements that the Debtors entered into in connection with the Senior Note Documents; and any defaults under the DIP agreement. *Id.* at § 10.1.

77.    The entry into the RSA was the product of extensive negotiation with the Senior Secured Noteholders, has their full support along with their financial commitments through the DIP financing, and is a significant achievement that allows for a more orderly and streamlined chapter 11 process than would otherwise be feasible.  The RSA provides, subject to the Court's approval of its assumption, a clear roadmap for the Debtors to promptly and efficiently emerge from bankruptcy equipped to implement their strategic plan.

78.    The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the intent to (i) move beyond the terminated PPA and sell power through alternate channels, either on the merchant market or through a new power purchase agreement, (ii) continue producing renewable energy by entering into new arrangements with different buyers of energy and other products produced by the Facility, and (iii) seek confirmation and implementation of a chapter 11 plan, with the support of the Senior Secured Noteholders, that provides for a toggle between (a) a debt-for-equity swap with the Senior Secured Noteholders and (b) if a superior offer emerges, a sale of the Facility and the Facility Site to a third party buyer.

79.    The Senior Secured Noteholders' support, evidenced by the RSA and the DIP Facility (as defined below), is critical to the Debtors' ability to implement the restructuring. Notably, the Debtors' business operations are sound, the Facility is well-run and no operational fix is required.  Rather, the sole impediment to the success of the Facility and the Debtors' stakeholders was the uneconomic and now-terminated PPA.  Free of the restrictions of the PPA,

the Debtors can meet current trade and operational obligations by selling Products at market prices. They also do not need a lengthy period in Chapter 11 to negotiate a new capital structure. Because the PPA has been terminated and the Debtors' reorganization efforts enjoy broad support amongst their stakeholders, the Debtors believe they can move quickly to a plan of reorganization and, if preferable, a sale process.

## V.

## FIRST DAY MOTIONS AND ADVERSARY PROCEEDING[14]

80.    To minimize the adverse effects of the commencement of the Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed the following motions:

- *Motion of the Debtors for Order (I) Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and (II) Granting Related Relief* (the "Joint Administration Motion");

- *Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* (the "Claims Agent Retention Application");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Financing Motion");

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Authorizing the Continued Use of Existing Cash Management, (III) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b), and (IV) Granting Related Relief* (the "Cash Management Motion");

---

[14] Capitalized terms not defined within this Section V shall have the meanings ascribed to such terms in the respective First Day Pleadings.

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Related Obligations and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests* (the "Tax Motion");

- *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue their Insurance Policies and (B) Pay All Obligations with Respect Thereto; (II) Authorizing Continuation of Insurance Premium Financing Arrangements; and (III) Granting Related Relief* (the "Insurance Motion");

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services; (II) Determining Adequate Assurance of Payment for Future Utility Services; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief* (the "Utilities Motion");

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and (II) Granting Relating Relief* (the "Critical Vendors Motion");

- *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue Performing Under Certain Shared Services Agreements and Honor Obligations Related Thereto; and (II) Granting Related Relief* (the "Shared Services Motion");

- *Debtors' Motion for Interim and Final Orders (I) Approving Entry Into New Lead Market Participant Agreement and (II) Granting Related Relief* (the "LMP Motion"); and

- *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Reject the Power Purchase Agreement and Option Agreement with Eversource Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief* (the "PPA Rejection Motion").

81.    I have reviewed each of the First Day Pleadings, including any exhibits thereto, and the statements and facts set forth in each of the First Day Pleadings are true and correct to the best of my knowledge, information and belief.  I hereby incorporate by reference each of the factual statements set forth in the First Day Pleadings.  The First Day Pleadings seek authority to, among other things, jointly administer the Chapter 11 Cases for procedural purposes only, retain a claims agent, ensure the continuation of the Debtors' cash management systems and other business

operations without interruption, authorize payment of certain prepetition taxes, authorize the Debtors to continue their insurance policies, provide the Debtors with debtor in possession financing, authorize the Debtors to continue performing under certain shared services agreements, authorize the Debtors to engage a lead market participant that will allow the Debtors to continue to sell Products with minimal interruption, and reject the PPA and attendant contractual obligations (to the extent not already validly terminated). I believe that the relief requested in the First Day Motions is necessary to prevent irreparable harm and to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

82.     Certain of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their request for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

### Joint Administration Motion

83.     Through the Joint Administration Motion, the Debtors request entry of an order (i) directing the joint administration of the Chapter 11 Cases for procedural purposes only, (ii) parties in interest to use the consolidated caption referenced therein for any pleading relating to any of the jointly-administered cases, and (iii) granting related relief. The Debtors submit that granting the Joint Administration Motion will ease the administrative burden associated with the Chapter 11 Cases for the Court and all parties in interest.

84.     Specifically, joint administration of the Chapter 11 Cases will remove the need to prepare, replicate, file and serve duplicative notices, applications and orders, saving substantial time and expense to the Debtors and their estates.  The Debtors believe that joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors and their creditors.

### Claims Agent Retention Application

85.     Through the Claims Agent Retention Application, the Debtors seek an order appointing Epiq Corporate Restructuring, LLC ("Epiq") as the Debtors' claims and noticing agent in the Chapter 11 Cases.  The Debtors believe the appointment of Epiq as the Claims and Noticing Agent in the Chapter 11 Cases will expedite the distribution of notices and the processing of claims and facilitate other aspects of the Chapter 11 Cases.  In view of the number of anticipated claimants and parties in interest and the complexity of the Debtors' business, the Debtors believe that the appointment of Epiq is both necessary and in the best interests of the Debtors' estates, creditors and other parties in interest because the Debtors will be relieved of the burdens associated with claims and noticing services.

86.     Prior to the selection of Epiq, the Debtors reviewed and compared engagement proposals from four (4) court-approved claims and noticing agents to ensure selection through a competitive process.  The Debtors believe, based on their analysis, that Epiq's rates are competitive and reasonable given its quality of services and expertise.

### DIP Financing Motion

87.     Through the DIP Financing Motion, the Debtors request entry of interim and final orders authorizing the Debtors to obtain the DIP Facility in the aggregate principal amount of up to $54 million, granting the DIP Facility and all obligations owing thereunder allowed

superpriority administrative expense claims status in each of the Chapter 11 Cases, authorizing the Debtors to use the Prepetition Collateral, providing adequate protection to the Prepetition Agent, for the benefit of itself and the Prepetition Noteholders, and seeking related relief.  The DIP Facility consists of (i) a new money delayed-draw term loan facility in the aggregate principle amount of up to $18 million, including up to $4.4 million available to the Debtors on an interim basis; and (ii) roll-up loans to refinance on a pro rata basis across the holdings of the Prepetition Obligations of the DIP Lenders upon entry of the Interim Order, and on entry of the Final Order, on a 2:1 ratio times the principal amount of the committed Interim DIP Term Loans and the Final DIP Term Loans, as the case may be.

88.     The Debtors have limited cash on hand and, if Eversource is permitted to credit the excess CRF against Energy delivered in January 2024, no projected operating revenue for the sale of Energy.  The Debtors are in default under their prepetition financing facilities. They have insufficient funds available to pay the administrative expenses of the Chapter 11 Cases or to support an effective reorganization absent access to a post-petition financing facility and use of cash collateral.

89.     Leading up to the Petition Date, the Debtors' Senior Secured Noteholders offered to support the Debtors through the DIP Facility to give the Debtors breathing room to stabilize by retaining independent professionals, to operate the Facility, and to fund an orderly sale process and reorganization to maximize value for the Debtors and their stakeholders.

90.     Under the present circumstances, the Debtors are unable to obtain more favorable financing than that proposed in the DIP Documents and have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.  In discussions with the Debtors, the Senior Secured Noteholders have indicated that

they believe they are likely under-secured. Accordingly, they would not have consented to having their liens primed by a post-petition lien, nor would they have agreed to permit the Debtors to grant post-petition liens that are *parri passu* with their prepetition liens. Moreover, the Debtors, with the assistance of SSG, solicited proposals for third-party debtor-in-possession financing. Due to the Debtors' financial position, their existing leveraged capital structure, and the size of the financing need, the Debtors were unable to identify any interested third-party financing parties on a junior or unsecured basis.

91.     Thus, in order for the Debtors to obtain alternative financing, the Debtors would have had to undertake a nonconsensual priming lien fight (assuming they were able to identify a financing source, which they were unable to do), which would have been costly and would have increased the level of uncertainty in the Chapter 11 Cases. Given the Debtors' lack of funds, the Debtors determined that such a fight was not in the best interest of the Debtors or their estates, and they were unable to find any alternative sources of financing. Additionally, the Debtors believe that the terms of the DIP financing offered by the Prepetition Noteholders are fair and reasonable in the circumstances.

### Cash Management Motion

92.     Prior to the Petition Date, the Debtors maintained four (4) bank accounts: (i) an account (SX7590-001) held in the name of Burgess BioPower at DBTCA, which comprises three (3) subaccounts (SX7590-00.1; SX7590-001.2; SX7590-001.3) (the "Burgess Revenue Account"); (ii) an account (SX7590) held in the name of Berlin Station at DBTCA, which is comprised of four (4) subaccounts (SX7590.1; SX7590.4; SX7590.5; SX7590.6) (the "Berlin Issuer Account," and together with the Berlin Revenue Account, the "DB Bank Accounts"); (iii) a checking account (5859) held in the name of Burgess BioPower at M&T Bank ("M&T") (the

"Burgess M&T Checking Account"); and (iv) a checking account (1322) held in the name of Berlin

Station at M&T (the "Berlin M&T Checking Account," and together with the DB Bank Accounts

and the Burgess M&T Checking Account, the "Bank Accounts").  The Debtors maintain the Bank

Accounts to manage the funds they hold to operate their business.  The Bank Accounts are part of

a carefully constructed cash management system (the "Cash Management System") that ensures

the Debtors' ability to efficiently monitor and control their cash position and disburse funds to

satisfy their obligations and to comply with terms and conditions of their secured financing

arrangements.  The DB Accounts are governed by the Subordination Agreement.

93.     Additionally, Berlin Station maintains an account (X3574) held at BlackRock, Inc.

("BlackRock") that was set up as part of compliance requirements with ISO-NE.  This account is

inactive and has no money in it.  The Debtors are not putting money into or trading in this account.

94.     Generally, Burgess BioPower submits a disbursement requisition monthly and

Berlin Station submits a disbursement requisition on a quarterly and semiannual basis to DBTCA

(each, a "Disbursement Requisition"), identifying each obligation Burgess BioPower or Berlin

Station, as applicable, needs to have paid.  Disbursement Requisitions have been submitted to

DBTCA at other times as well.  Disbursement Requisitions are reviewed and approved by the

Required Holders (as that term is defined in the Senior Note Documents).

95.     DBTCA is the only party authorized to make disbursements and transfers from the

Burgess Revenue Account on behalf of Disbursement Requisitions.  DBTCA transfers money to

the Burgess M&T Bank Account, from which both Burgess BioPower's and Berlin Station's

operating expenses, as well as lease obligations and other fees (outside of principal and interest)

under the Senior Documents, are paid.

96.     On a quarterly basis, DBTCA transfers funds from the Burgess Revenue Account to the Berlin Issuer Account, from which money is disbursed by DBTCA from the subaccount (SX7590.4) to principal and interest due and owing under the Senior Note Documents.  Funds are also transferred from the Burgess M&T Checking Account to the Berlin M&T Checking Account to facilitate intercompany transfers and make monthly payments to ISO-NE.  As of the Petition Date, the aggregate balance of  funds held in the Bank Accounts is approximately $3.4 million (all of which amounts are held in restricted accounts).

97.     CS Operations reconciles the Bank Accounts weekly and records all cash transactions into the Debtors' books and records.

98.     As part of the Cash Management System and in addition to the Bank Accounts, the Debtors also have a credit card with M&T (the "Company Credit Card"), with a credit limit of $20,000.00, which is billed and paid in full monthly.  The Company Credit Card is used to pay certain automatic recurring payments, one-off vendor payments, filing fees for regulatory requirement reports and other general business expenses incurred by personnel at the Facility to ensure important operating supplies and services required to operate the Facility are obtained timely.  The expenses incurred on the Company Credit Card is essential to the operation of the Debtors' business.  The Debtors typically charge less than $5,000.00 per month on the Company Credit Card.  As of the Petition Date, the Debtors estimate that they have less than $5,000.00 of unpaid obligations on the Company Credit Card.

99.     In the ordinary course of business, the Debtors use checks with their names printed thereon.  The Debtors also maintain pre-printed correspondence and business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, internal

administrative forms and other business forms (collectively, along with the Debtors' checks, the "Business Forms").

100.    Through the Cash Management Motion, the Debtors seek entry of interim and final orders: (i) authorizing the maintenance of the Bank Accounts and the Company Credit Card and continued use of the Business Forms; (ii) authorizing continued use of the Cash Management System; and (iii) granting related relief.  The Debtors also seek authority to pay the Bank Accounts' related fees, close or otherwise modify the terms of the Bank Accounts, and open new debtor-in-possession accounts as may be necessary to facilitate the Chapter 11 Cases and the Debtors' business operations.  The Debtors submit that their continued use of the Bank Accounts, the Company Credit Card, the Business Forms and the Cash Management System are essential to operation of their business in the Chapter 11 Cases.

*Tax Motion*

101.    In the ordinary course of business, the Debtors incur various state and local income, property, sales and use taxes and similar taxes and obligations (collectively, the "Taxes") owed to certain taxing authorities (the "Taxing Authorities").  As of the Petition Date, the Debtors estimate that there are approximately $0.3 million in Taxes that have accrued as of the Petition Date, consisting of (i) $0.21 million related to RECs, (ii) $0.09 million related to various state and local taxes.  The Debtors believe that no Taxes will become due in February 2024.

102.    Nevertheless, failure to pay the accrued Taxes could result in interest and penalties charged to the Debtors, and there could be unforeseen Taxes that come due in February.  Accordingly, through the Tax Motion, Debtors are seeking interim and final orders (i) authorizing the Debtors to pay unpaid prepetition Taxes owed to the Taxing Authorities subject to the imposition of an interim cap of $0.2 million and a final cap of $0.3 million; and (ii) authorizing

and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the Taxes.

### *Insurance Motion*

103.    In connection with the operation of their business, the Debtors, under the advisement and administration of CS Operations, maintain various insurance policies providing coverage to, among other things, commercial general liability, commercial property, automobile, crime, fiduciary, products and management liability, director and officer liability, workers' compensation and employment practices liability (collectively, the "Insurance Policies"), and incur premiums and other obligations related thereto (collectively, the "Insurance Obligations").

104.    The Debtors generally obtain the Insurance Policies through arrangements with the Insurance Service Providers (as defined below).  The Debtors have procured the Insurance Policies through several different insurance carriers (the "Insurers").  The Insurance Policies help limit the various risks associated with operating the Debtors' business and are essential to the continued operation of the Debtors' business in the Chapter 11 Cases.  Some of the Insurance Policies are required by regulations, laws and contracts that govern the Debtors' commercial activities.  The Debtors believe the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

105.    The Insurance Policies generally require the Debtors to pay premiums based upon fixed or variable annual rates established by the Insurers (collectively, the "Insurance Premiums") at the beginning of the applicable policy period and certain policies are paid in quarterly installment.  The Insurance Premiums are typically billed directly by the Insurers to the Insurance Service Providers (as defined below) on or soon after a given insurance policy's period date, and are paid by the Debtors through the Insurance Service Providers.  The Debtors pay the Insurance

Premiums through lump sums on an annual basis, through monthly financing arrangements or under quarterly installments. The Debtors paid approximately $2.1 million on account of the Insurance Premiums for policy year 2023 (including the Insurance Service Providers' Fees (as defined below)).

106.    In connection with maintaining the Insurance Policies, the Debtors employ Breckenridge Insurance and Varney Agency (collectively, the "Insurance Service Providers") to help them procure, negotiate and evaluate the Insurance Policies and process claims related thereto. The Insurance Service Providers are paid commissions on the Insurance Policies directly by the Insurers based on a predetermined percentage of premiums (the "Insurance Service Providers' Fees").

107.    The Insurance Service Providers are intimately familiar with the Debtors, their insurance needs and the Insurance Policies. The Insurance Service Providers therefore play a critical role in the procurement and renewal of the Insurance Policies.

108.    Through the Insurance Motion, the Debtors are seeking interim and final orders authorizing the Debtors to maintain the Insurance Policies and honor the Insurance Obligations, including amounts owed to the Insurance Service Providers or to make payments on or enter into insurance financing arrangements, in the ordinary course of business during the Chapter 11 Cases, in addition to other relief specified in the Insurance Motion. Continuing the Insurance Policies and the Debtors' relationships with the Insurance Service Providers is essential to the continued operation of their business during the Chapter 11 Cases.

### Utilities Motion

109.    In connection with the operation of their business and management of their properties, the Debtors historically obtained water, electricity, internet and other similar services

(collectively, the "Utility Services") from a number of utility providers or their brokers (collectively, the "Utility Providers," and each, a "Utility Provider").  On average, the Debtors paid approximately $0.2 million per month for Utility Services.  The Debtors estimate that the prepetition amount due for the Utility Services is approximately $0.3 million.  The Debtors further estimate that their cost for the Utility Services during the postpetition period will average approximately $0.25 million per month, which reflects an above-average demand for electricity.

110.    The Debtors intend to pay prepetition and postpetition obligations to the Utility Providers in a timely manner.  Cash held by the Debtors and cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtors' utility services obligations in accordance with their prepetition practices.

111.    To provide additional assurance of payment, if requested by a Utility Provider, the Debtors propose to deposit $0.1 million (the "Adequate Assurance Deposit"), which represents approximately 50% of the average monthly cost of the Utility Services, calculated based on the Debtors' average monthly cost of the Utility Services over the twelve-month period preceding the Petition Date, into a segregated account to be established by the Debtors (the "Adequate Assurance Account").  The Adequate Assurance Deposit will be held by the Debtors in the Adequate Assurance Account in the amount set forth for each Utility Provider in the Utilities Motion.

112.    The Debtors submit that uninterrupted Utility Services are critical to the Debtors' ongoing operations, and through the Utilities Motion, the Debtors seek an order (i) prohibiting the Utility Providers from altering, refusing or discontinuing services; (ii) deeming the Utility Providers adequately assured of future performance; (iii) establishing procedures for determining adequate assurance of future payment; and (iv) granting related relief.

### *Critical Vendors Motion*

113.    The Debtors' operation of the Facility is dependent upon their access to various essential goods and services provided by certain vendors and service providers.  Prior to the Petition Date, the Debtors reviewed their accounts payable, have estimated accrued costs and expenses, and consulted with the appropriate people responsible for the Debtors' operations to identify the vendors and service providers that are essential to the Debtors' ongoing operations (collectively, the "Critical Vendors").  In connection with that assessment, the Debtors considered the following criteria, among others: (i) whether the vendor or service provider is a "sole source provider"; (ii) whether the Debtors can find a reasonable vendor or service provider within a reasonable timeframe; (iii) whether agreements to which the Debtors are a counterparty permit the Debtors to substitute a vendor or service provider; (iv) whether the vendor or service provider is party to an executory contract, and if so, whether any interruption in the goods or services during which the Debtors can seek enforcement of a potential violation of the automatic stay, would have a materially adverse impact on the Debtors' estates; (v) whether the vendor or service provider may be able to assert a lien against the Debtors' property on account of any unpaid amounts; (vi) whether a vendors' prepetition claim is entitled to administrate expense status under Section 503(b)(9) of the Bankruptcy Code; and (vii) whether the Debtors have sufficient goods stored in order to continue operations while a replacement vendor is found.

114.    Among the types of Critical Vendors identified by the Debtors are certain providers of consumables used in the operation of the Facility and certain providers of fuel, maintenance, operations, supplies and other technical services necessary for the operation of the Facility.  These vendors are essential to the Debtors' business because they, among other things, possess unique technical knowledge related to the operation of the Facility, have familiarity with the equipment

used in the operation of the Facility, provide unique materials and services to the Debtors that are vital to the Facility and the Debtors' business, are closer in proximity to the Facility than alternative providers, are single source providers or provide some combination of the foregoing.  The Debtors have single source suppliers for fuel, maintenance, and operating supplies.  The Debtors believe finding alternative suppliers would be challenging during the course of the Chapter 11 Cases and may create disruption or cessation of the Facility's operations.

115.    The Debtors do not believe that there are any amounts owed to the Critical Vendors as of the Petition Date, but, due to the difficulties of estimating claims that might be owed to the Critical Vendors, the Debtors estimate that the Critical Vendors could be owed up to $1.0 million (the "Critical Vendor Claims") as of the Petition Date.  Of this estimate, approximately $0.5 million is owed to the Debtors' sole supplier of fuel and $0.4 million is due to providers of maintenance services to the Facility.  The Facility requires two annual eight (8) day shutdowns for maintenance and repair which generally occur in the spring and fall of each year.  The 2023 fall shut down was delayed until December 2023 and therefore, as of the Petition Date, the prepetition maintenance amounts are higher than the average of approximately $0.2 million in normal operating months because of the recent maintenance and repair services. This group of vendors is critical to the operations of the Facility for ongoing maintenance, safety and efficiency.  Without the parts and services provided by these Critical Vendors, the Debtors will incur excessive down time at the Facility if an unforeseen equipment breakdown occurs.  Furthermore, without these Critical Vendors, the skill, experience, and components required to efficiently and safely perform the planned eight-day maintenance shut down in April will not be available causing unnecessary expense, delay and potential safety hazards.

116.     Another $0.3 million of the Critical Vendor Claims are of vendors who supply leased equipment, supply chemicals required to run the Facility, provide disposal of ash/chemicals inherent to the Facility's operations and provide employee uniforms and safety supplies.  The Debtors' remote location poses challenges to sourcing these critical commodities required to run the Facility.

117.     The Debtors believe that some of the Critical Vendors will continue to do business with them after the commencement of the Chapter 11 Cases because doing so is a good business decision.  However, the Debtors anticipate that certain Critical Vendors may refuse to deliver goods or provide services without payment of their Critical Vendor Claims or refuse to deliver goods or provide services on reasonable price or credit terms absent payment of their Critical Vendor Claims.

118.     Through the Critical Vendors Motion, the Debtors, out of an abundance of caution, seek entry of orders authorizing the Debtors to pay certain prepetition claims held by Critical Vendors and other related relief as further specified in the Critical Vendors Motion.  The Debtors believe that the relief sought in the Critical Vendors Motion is essential to the Debtors continued operation of their business.

### Shared Services Motion

119.     As noted above, the Debtors do not have any employees and do not themselves operate or manage the Facility, but instead contract with non-debtor affiliates to perform certain shared services necessary to conduct the Debtors' business.  Accordingly, CS Berlin Ops and CS Operations, pursuant to the O&M Agreement and the PMA (together, the "Shared Services Agreements"), respectively, provide the Debtors with the services needed to conduct the Debtors' business.

120.     The Debtors believe that the satisfaction of their obligations relating to the Shared Services Agreements, whether arising prepetition or postpetition, is necessary to maintain the Debtors' relationships with their service providers and ensure the continued availability and commercially reasonable pricing of such services.   Accordingly, the Debtors intend to seek authority from the Court to continue to pay obligations under the Shared Services Agreements that arose prepetition and to honor their obligations under those agreements in the ordinary course post-petition.

### *LMP Motion*

121.     In order to participate in ISO-NE's markets, including those that provide for the sale of energy and capacity to wholesale customers in New England, power producers must register as a Market Participant with ISO-NE.   Berlin Station is registered as a Market Participant with ISO-NE.   Berlin Station's status as a Market Participant allows the Facility to sell energy and capacity to wholesale customers in New England.

122.     In addition, designation of a Lead Market Participant is a prerequisite for the Debtors to participate in ISO-NE's wholesale markets for energy and capacity.   ISO-NE's wholesale markets are the only wholesale market into which the Debtors can realistically sell energy and capacity.   As such, the absence of a cooperative Lead Market Participant will jeopardize the Debtors' ability to sell energy and capacity.   The Debtors may transfer the Lead Market Participant status at any time, except from a window of time spanning from fifteen (15) business days prior to the annual capacity auction through the end of the auction, which began on February 5, 2024, and ended on February 7, 2024.   During that restricted window, the Debtors could not change their Lead Market Participant for capacity market transactions, but can still transfer the Lead Market Participant for energy market transactions.

123.    The only way to transfer the Lead Market Participant role under ISO-NE's existing process is for the existing Leading Market Participant to initiate the transfer on ISO-NE's Customer Asset Management System ("CAMS") for energy and through execution of a fillable portable document format form for Capacity.  Neither the Debtors nor ISO-NE has the ability to initiate the transfer.

124.    Pursuant to the now-terminated PPA, Eversource was designated as the Facility's Lead Market Participant.  *See* PPA at § 9.7.  Eversource retains that status today on CAMS notwithstanding the Debtors' termination of the PPA.  As the Facility's Lead Market Participant, Eversource operates as the Debtors' agent for purpose of selling energy into ISO-NE through offering into day-ahead and real-time organized markets and capacity into ISO-NE through the annual capacity auction.[15]

125.    Through the LMP Motion, the Debtors seek interim and final orders authorizing the Debtors to enter into a Lead Market Participant Services Agreement (the "LMP Agreement") in which its affiliate and current service provider CS Berlin Ops would serve as the Facility's Lead Market Participant.  CS Berlin Ops is already authorized by ISO-NE to service as a lead market participant.  Accordingly, any transition would be seamless.  The LMP Agreement will provide the Debtors with the ability to continue to participate in ISO-NE's energy and capacity markets, which will be essential to the Debtors' generating revenue during the Chapter 11 Cases and thereafter.  The LMP Motion also seeks an order directing Eversource to initiate the transfer of the Lead Market Participant role to CS Berlin Ops or other Lead Market Participant of the Debtors'

---

[15] During the capacity auction, the Debtors and other capacity providers compete to obtain a commitment to supply capacity in three years' time, referred to as a capacity supply obligation. The Debtors rely on their capacity supply obligation for a stable revenue stream.

choosing and, subject to entry of the Proposed Final Order, remit all revenue Eversource received in its role as Lead Market Participant of the Debtors to the Debtors.

### PPA Rejection Motion

126.     As explained in further detail above, Eversource materially breached the PPA prior to the Petition Date by failing to pay the Debtors approximately $3.6 million on January 23, 2024. After Eversource failed to timely cure its breach, the Debtors terminated the PPA pursuant to its terms on February 8, 2024.  Pursuant to the terms of the PPA and the Option Agreement, the Debtors subsequently terminated the Option Agreement also on February 8, 2024. Notwithstanding, Eversource continues to unlawfully withhold payments due to the Debtors while refusing to recognize the Debtors' valid termination of the PPA and the Option Agreement.  The Debtors bring the PPA Rejection Motion solely as a prophylactic comfort order, in the event Eversource contests the prepetition termination, in order to confirm that they can sell the Facility's Products into the market, free from the burden of the PPA and the Option Agreement, which will enable the Debtors to continue to generate revenue and will facilitate an orderly reorganization during the Chapter 11 Cases.

127.     The Debtors, in the exercise of their business judgment and in conjunction with their advisors, have determined that, if their termination of the PPA is found to be invalid, the projected cost of continuing performance under the PPA far exceeds the ongoing value of the PPA. In particular, in light of the cessation of the legislative moratorium on Eversource's purported ability to credit the amounts in excess of $100 million in the CRF, in monthly installments, the Debtors can no longer continue performance under the PPA without compromising their financial viability.

128.    Instead of selling the Facility's Products to Eversource pursuant to the PPA, the Debtors plan to sell electricity through the open market to ISO-NE's electric grid immediately and pursue a new power purchase agreement or agreements to maximize the value of the Debtors and their estates.  Accordingly, the Debtors have determined in the exercise of their business judgment that the PPA with its attendant Option Agreement should be rejected, to the extent it has not already been validly terminated.

129.    Through the PPA Rejection Motion, the Debtors request entry of an order authorizing the Debtors to reject the PPA and the Option Agreement (to the extent not already validly terminated) *nunc pro tunc* to the Petition Date and related relief, including requiring Eversource to cooperate with the Debtors to effectuate the rejection of the PPA and the Option Agreement by, among other things, executing any required regulatory documents.

### *Adversary Proceeding*

130.    In addition to the First Day Pleadings, Berlin Station intends to initiate an adversary proceeding against Eversource for turnover of estate property, and also asserting preference and fraudulent transfer claims against Eversource.  As explained in further detail above, Eversource materially breached the PPA by improperly withholding monies due for payment of RECs delivered during the third quarter of 2023 and Capacity delivered during the month ending December 31, 2023.

**\*\*\*\*\*\*\*\*\*\*\***

131.    In sum, I believe that the relief sought in the First Day Pleadings: (i) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss in value; (ii) is necessary to provide the Debtors with a reasonable opportunity to reorganize their balance sheets

and emerge from the Chapter 11 Cases as a financially viable power company contributing energy to the power grid; and (iii) best serves the interests of the Debtors' stakeholders.

## <u>DECLARATION</u>

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 9, 2024

**Berlin Station, LLC**

By: _/s/ Dean Vomero_
Dean Vomero
Chief Restructuring Officer

**Burgess BioPower, LLC**

By: : _/s/ Dean Vomero_
Dean Vomero
Chief Restructuring Officer