IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Burgess BioPower, LLC, | ) Case No. 24-10235 (LSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| Berlin Station, LLC, | ) Case No. 24-10236(LSS) |
| | ) |
| Debtor. | ) (Joint Administration Pending) |

**MOTION OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, PURSUANT TO
28 U.S.C. § 1412 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE
1014(a), TO TRANSFER VENUE OF BANKRUPTCY PROCEDINGS TO UNITED
STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW HAMPSHIRE**

Public Service Company of New Hampshire ("PSNH"), by
counsel, pursuant to 28 U.S.C. § 1412 and Rule 1014(a) of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
hereby moves (the "Venue Motion") to transfer venue of these
bankruptcy proceedings to the United States Bankruptcy Court for
the District of New Hampshire (the "NH Bankruptcy Court"), and
states the following:

## INTRODUCTORY STATEMENT

These bankruptcy cases belong in New Hampshire.  The
Debtors own and operate a biomass-fueled electrical generation
facility (the "Facility"), which is located and operates
exclusively in Berlin, New Hampshire. Debtor Berlin Station owns

1

the Facility and the related land and equipment, which is Berlin Station's sole asset.  Debtor Burgess is the "Operator" of the Facility pursuant to a lease agreement between Burgess and Berlin Station.  Moreover, contrary to what they assert in their voluntary petitions,[1] each Debtor has its principal place of business in New Hampshire.

The Facility supplies electricity exclusively within New Hampshire to PSNH under a Power Purchase Agreement (defined in paragraphs 20 and 21 herein, the "PPA") governed by New Hampshire law.  The PPA was conditioned on regulatory approval by the New Hampshire Public Utilities Commission (the "NHPUC"), allowing for full cost recovery by PSNH of the rates, terms and conditions of the agreement and protecting New Hampshire citizens from paying too much for electricity.  Accordingly, there is substantial public interest in having issues concerning the Facility and their effects on New Hampshire citizens resolved by the New Hampshire Bankruptcy Court, which currently has pending before it the bankruptcy of the prior, related operator of the Facility and has familiarity with the history and operations of the Facility, the constituencies involved, and the impact of the Facility's operations on the

---

[1] The Debtors' bankruptcy petitions list a CS Ops address in North Palm Beach, Florida as their principal place of business, but that is not what the Debtors' current business records filed with the New Hampshire Secretary of State reflect.  Further, CS Ops' current principal place of business is the Loudon Road Address as reflected in the New Hampshire Secretary of State's records.

citizens of New Hampshire.

An important part of the PPA is the recovery of the Excess Cumulative Reduction, which is described in more detail in paragraphs 24 to 31 of this Motion. The recovery of the Excess Cumulative Reduction by PSNH has been delayed for several years because the Debtors claimed that if PSNH began taking those credits the Debtors would not have adequate income to continue plant operations. In response, the State of New Hampshire and the NHPUC intervened and have been highly involved with the PPA and the Excess Cumulative Reduction. Twice, in 2018 and again in 2022, the General Court of New Hampshire (the "Legislature") decided that the continued operation of the Facility was sufficiently important to the energy infrastructure of New Hampshire and to the health of the state's forests and timber industry to require the Commission to impose a moratorium against PSNH performing its' contractual duty to collect the Excess Cumulative Reduction. Although the Legislature tried again to extend this moratorium in 2023, the Governor of New Hampshire vetoed the legislation. As a result, the government of the State of New Hampshire has determined that the citizens of New Hampshire should no longer continue to subsidize the Facility by paying increased rates for electricity. Thus, the moratorium expired on November 30, 2023, allowing PSNH to begin applying credits against the Debtors' invoices for the over $71.5 million owed for the Excess Cumulative Reduction.

The Debtors claim that PSNH's recouping amounts owed related to the Excess Cumulative Reduction breached the PPA and gave them a right to terminate the PPA for nonpayment.  PSNH disputes that any amounts owed were not paid.  PSNH further disputes the Debtors' claim of breach and alleged termination.  Prior to the alleged termination, PSNH invoked the dispute resolution procedures in the PPA, which require binding arbitration of the payment dispute, breach, and termination issues in New Hampshire. Most relevant witnesses for resolving the dispute, including current and former employees and managers, in all likelihood, either reside in New Hampshire or regularly conduct business in New Hampshire.

Furthermore, the Debtors expressly agreed, and waived all objections, to venue being placed in New Hampshire courts for all disputes arising out of the agreement pursuant to which the Debtors sell the Facility's products to PSNH.  Accordingly, PSNH requests that the court transfer venue of these bankruptcy cases to the NH Bankruptcy Court, pursuant to 28 U.S.C. § 1412, "in the interest of justice or for the convenience of the parties.

## FACTS

### Jurisdictional Facts

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.   Venue of this Venue Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory predicate for the relief requested herein is 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a).

## **Procedural Facts**

5.    On February 9, 2024 (the "Petition Date"), each of Berlin Station, LLC ("Berlin Station") and Burgess BioPower, LLC ("Burgess"; and together with Berlin Station, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court.

6.    The Debtors continue to operate their businesses and manage their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion seeking joint administration of their bankruptcy cases.

## **Facts Regarding Debtors**

7.    The Debtors own and operate a biomass-fueled electrical generation facility (the "Facility"), which is located and operates exclusively in Berlin, New Hampshire.

8.    Debtor Berlin Station owns the Facility and the related land and equipment, which is Berlin Station's sole asset.

9.    Debtor Burgess is the "Operator" of the Facility pursuant to a lease agreement between Burgess and Berlin

Station.

10.   CS Operations, Inc. ("CS Ops"), an affiliate of the Debtors, provides management and day-to-day operations services to the Facility and supplies all employees to the Facility pursuant to the terms of a Project Management Agreement between CS Ops, as assignee of Cate Street Capital, Inc. ("Cate Street Capital"), and Berlin Station (the "Project Management Agreement").

11.   According to Annual Reports of the Debtors filed with the New Hampshire Department of State:

A.   Berlin Station and Burgess are Delaware limited liability companies.

B.   The principal place of business for each of the Debtors through at least March of 2022 was listed as One Cate Street, Portsmouth, New Hampshire 03801 (the "Cate Street Address").

C.   The current principal place of business for each of the Debtors is 1 Old Loudon Road, Concord, New Hampshire 03301, which is the location of the Facility (the "Loudon Road Address").

D.   The principal purpose of Berlin Station is to develop, own and operate the Facility.

E.   The principal purpose of Burgess is to lease the Facility.

12.   PSNH, which purchases nearly 100% of the products produced by the Facility, is located in and operates exclusively in New Hampshire.

13.   As of December 1, 2023, PSNH became Berlin Station's largest creditor apart from its secured lenders.

14.   The Facility's primary supplier, Richard Carrier Trucking, Inc. ("Richard Trucking"), is located and operates in New Hampshire and in Maine.  It is not located in and, upon information and belief, does not operate in Delaware.

15.   Deutsche Bank Trust Company Americas, the Collateral Agent for the Debtors' secured lenders, is located in New York and has an address of 60 Wall Street, 27th Floor, New York, New York 10005.

16.   The employees of the Facility, whom CS Ops supplies pursuant to the Project Management Agreement, presumably are located in or near New Hampshire and, in any event, regularly conduct business in New Hampshire.

17.   As both the Facility and the Debtors' principal place of business are located in New Hampshire, upon information and belief, the Debtors' books and records are located in New Hampshire.

18.   The New Hampshire Public Utilities Commission ("NHPUC") regulates the Facility, its exclusive customer (PSNH), and the terms of the Power Purchase Agreement pursuant to which

the Debtors sell the Facility's products to PSNH.

19.   The New Hampshire legislature has determined that operation of the Facility "(a) is desirable to the energy infrastructure of the state of New Hampshire; (b) is a source of indigenously-sourced, reliable baseload power that contributes to regional fuel security and reliability of the regional electricity grid; (c) is important for the attainment of renewable energy portfolio standard goals of fuel diversity, capacity, sustainability and energy independence; (d) is significant to the continued health of New Hampshire's forests; (e) provides valuable support to the timber industry; and (f) is a contributor of jobs and to the economy of both the North Country and the state as a whole."  2022 New Hampshire Laws Ch. 275 (S.B. 271)(A true and accurate copy of the foregoing statute is attached as **Exhibit 1**.)

## The Power Purchase Agreement Between Berlin Station and PSNH

20.   PSNH and Laidlaw Berlin Biopower, LLC ("LBB") entered into a Power Purchase Agreement, dated as of June 8, 2010 (the "Original PPA") with respect to the development and operation of the Facility.  On April 18, 2011, after extensive proceedings before the NHPUC,[2] the NHPUC entered an Order Granting

---

[2] In connection with its issuance of Order No. 25,213, the NHPUC heard and considered extensive evidence and arguments of counsel for numerous interested parties, including the City of Berlin, the Office of Consumer Advocate on behalf of residential ratepayers, NHPUC Staff, PSNH, and others, in determining that the terms of the Original PPA,

Conditional Approval of the PSNH Petition for Approval of Purchased Power Agreement with Laidlaw Berlin BioPower, LLC in Order No. 25,213, conditioned upon certain modifications to the Original PPA, which were subsequently made. A true and accurate copy of Order No. 25,213 can be obtained from the following link to the NHPUC:

https://www.puc.nh.gov/Regulatory/Orders/2011orders/25213e.pdf. One required condition to NHPUC's approval of the Original PPA was "that the PPA be revised to add a provision that expressly recognizes the [NHPUC]'s retention of such traditional regulatory authority in such circumstances." NHPUC Order No. 25,213 at p. 98.

21.  Berlin Station, PSNH and LBB entered into an Amended and Restated Power Purchase Agreement, dated as of May 18, 2011 (as subsequently modified, the "PPA"), pursuant to which LLB assigned the Original PPA to Berlin Station and the parties amended and restated its terms in accordance with the NHPUC's conditions set forth in Order No. 25,213. A true and accurate copy of the PPA (without the subsequent amendments described below) is attached as **Exhibit 2**.

22.  Pursuant to the terms of the PPA, Berlin Station, as Seller, was to construct, operate, and maintain the Facility.

_____

as modified in accordance with the conditions of the Order, are reasonable and in the public interest.

Upon completion of the Facility and from and after its In-Service Date (which occurred June 1, 2014), Berlin Station is required to sell, and PSNH is required to purchase and accept delivery of nearly 100% of the Products produced by the Facility – consisting of electricity, renewable energy certificates (RECs), and capacity – for a 20-year term.  Specifically, all electricity and capacity generated by the Facility are sold exclusively to PSNH.  Further, all Class 1 RECs up to 400,000 Class 1 RECs annually (where each REC represents one MWh of generation) is sold exclusively to PSNH.  Annual RECs produced by the Facility in excess of that amount, if any, may be sold only in the regional Independent System Operator – New England ("ISO-NE") REC market, which includes New Hampshire but does not include Delaware.

23.  Pursuant to section 6.1.2 of the PPA, the electricity purchased by PSNH under the PPA is purchased at a fixed price that is adjusted quarterly, based on a formula set forth in the PPA, including the backward review of the price of wood (biomass fuel) paid in the quarter just completed.

### The Cumulative Factor and Excess Cumulative Reduction

24.  Section 6.1.4(a) of the PPA provides for a rolling negative or positive adjustment to be calculated to reflect the difference between the prices of electricity purchased under the PPA and applicable ISO-NE market energy prices, as follows:

For each MWh of Energy delivered during the Term of this Agreement, a negative or positive adjustment shall be determined. When the Adjusted Base Price (in $/MWh) in effect during an hour exceeds the ISO-NE Energy Price in that hour, the hourly negative adjustment shall equal the delivered MWhs multiplied by the difference between the ISO-NE Energy Price and the Adjusted Base Price. When the Adjusted Base Price (in $/MWh) is less than the ISO-NE Energy Price, the hourly positive adjustment shall equal the delivered MWhs multiplied by the difference between the ISO-NE Energy Price and the Adjusted Base Price. These negative and positive adjustments will be continuously aggregated to determine a cumulative net negative adjustment or net positive adjustment for the purpose of adjusting the price of any Facility purchase option by PSNH pursuant to Article 7 hereof, if exercised. At any point in time, the cumulative value of these adjustments is defined as the "Cumulative Factor". At any point in time, a net negative Cumulative Factor value is termed a "Cumulative Reduction". A Cumulative Reduction will serve to reduce the purchase price of the Facility as provided in the Purchase Option Agreement. A net positive Cumulative Factor will bestow no rights or obligations on either Party to this Agreement.

25.     Pursuant to section 6.1.4(c) of the PPA, if there exists a Cumulative Reduction in excess of $100 million at the end of any Operating Year, PSNH is required to credit such excess ("Excess Cumulative Reduction") against amounts otherwise due for Energy delivered to PSNH during the subsequent operating year until the Excess Cumulative Reduction is eliminated.  This credit is to be affected in 12 equal monthly credits (up to the full amount of the monthly payment otherwise due Berlin Station) or longer if such Cumulative Reduction exceeds charges to PSNH

over the subsequent year.  If upon expiration of the PPA's Term

PSNH does not purchase the Facility, Seller is required to

reimburse PSNH the value of any Excess Cumulative Reduction.

26.  In addition, pursuant to 10.3 of the PPA, PSNH is

required to discharge and net all mutual debts and payment

obligations due and owing under the PPA and/or the

Interconnection Agreement (a separate agreement between PSNH and

Berlin Station) to each other on the same date, such that only

the excess amount remaining due shall be paid by the party who

owes it.

27.  The price of electricity sold by Berlin Station to

PSNH under the PPA has been well over the applicable market

price throughout its term thus far.

28.  In accordance with orders entered by the NHPUC at the

direction of the New Hampshire legislature – *see* SB 577 [2018

N.H. Laws, ch. 340] and SB 271 [2022 N.H. Laws, ch. 275.1 –

Berlin Station and PSNH executed a First Amendment to the PPA

dated November 19, 2019, which suspended operation of the

Cumulative Reduction cap through November 30, 2022, and a Second

Amendment to the PPA dated August 18, 2022, which further

suspended operation of the Cumulative Reduction cap through

November 30, 2023.

A.  NHPUC Order No. 26,198 ordered the amendment of

Order No. 25,213 in accordance with SB 577, and NHPUC Order

No. 26,333 approved the First Amendment to the PPA and authorized PSNH's recovery of all costs of the Amended PPA from its electric utility customers.  True and accurate copies of NHPUC Order No. 26,198, SB 577 and NHPUC order No. 26,333 are attached as **Exhibit 3**.

B.   NHPUC Order No. 26,665 ordered the amendment of Order Nos. 25,213, 26,198, and 26,333 in accordance with SB 271 and ordered a New Hampshire Department of Energy investigation and audit of the Facility's costs and revenues.  NHPUC Order No. 26,705 approved the Second Amendment to the PPA and authorized PSNH to recover all costs of the amended PPA from its electric utility customers.  True and accurate copies of NHPUC Order Nos. 26,665 and 26,705 are attached as **Exhibit 4**; *see also* Exhibit 1.

29.   The Excess Cumulative Reduction is now in excess of $71 million.  The governor of New Hampshire recently vetoed the State of New Hampshire's legislature's bill that would have forgiven or further delayed PSNH's recapture of the Excess Cumulative Reduction pursuant to the price credit/reduction mechanism set forth in the PPA.  The December 2023 invoice for Energy and Capacity (as subsequently amended to account for the netting required by Section 10.3 of the PPA) issued and includes a $5,961,889.59 Energy Credit to begin recapturing the Excess

Cumulative Reduction in accordance with the terms of the PPA, as amended, and the NHPUC orders described above.  PSNH's payment of that invoice was due January 23, 2024, on which date PSNH effected the applicable recoupment required by the PPA and submitted a net payment of $1,801,868.33 to the Debtors.

30.   Pursuant to orders entered by NHPUC, PSNH recovers the full cost of the rates, terms and conditions of the PPA to PSNH through the rates that it charges its electric utility customers, which are all located in New Hampshire.

31.   The purpose of the Cumulative Reduction cap in the PPA is to protect New Hampshire ratepayers from the risk of paying over-market prices over the term of the PPA greater than $100 million (i.e., the projected potential future value of the Facility at the time when the PPA was being negotiated and approved) than if PSNH were obtaining electricity from traditional sources.  By using the Cumulative Reduction Factor to offset the over-market price of power, PSNH customers will have the opportunity to recapture the over-market payments, if any, made during the PPA term via the Purchase Option Agreement (described below).

## Pending NHPUC Regulatory Proceeding

32.   On December 15, 2023, PSNH filed a petition with the NHPUC (the "PSNH Petition"), including proposed revised tariffs, requesting that the Commission approve an adjustment to its

stranded cost recovery charge ("SCRC")[3] for effect on February 1, 2024.  The PSNH Petition, seeks to adjust PSNH's SCRC rate billed to residential customers going forward based in part upon PSNH's anticipated recoupment of the Excess Cumulative Reduction pursuant to the terms of the PPA.  In response to the PSNH Petition, the NHPUC issued an order commencing an adjudicative proceeding, DE 23-091, requesting certain data, and setting various filing deadlines.  The NHPUC held a status conference on January 11, 2024 and the initial hearing on January 19, 2024. While the New Hampshire Department of Energy and the Office of Consumer Advocate representing residential ratepayers participated in both hearings, the Debtors have not participated in the proceeding nor sought to intervene therein.

33.  On January 26, 2024, the NHPUC entered Order No. 26,938 approving the proposed adjustment to the SCRC on a partially-provisional basis and scheduled a further review proceeding and continued hearing for late February or early March 2024 to consider the portion of the proposed SCRC adjustment and resultant rates associated with PSNH's contract with the Burgess plant (i.e., the PPA).  The NHPUC anticipates

---

[3] For an explanation of the SCRC, see Section I of the *Commencement of Adjudicative Proceeding and Notice of Hearing, Status Conference, and Data Requests*, entered by the NHPUC on 12/22/23 in DE 23-091, concerning the PSNH Petition, attached as **Exhibit 5** hereto.

issuing further data requests concerning Burgess matters in advance of that hearing.

### PSNH Rights To Purchase Facility

34.   Under section 7.1 of the PPA, PSNH has a right of first refusal to purchase all or any portion of the Facility or its assets on terms and conditions, including price, not less favorable to PSNH than those on which Berlin Station proposes to sell such offered assets to a proposed transferee.

35.   Pursuant to section 7.2.1 of the PPA and a Purchase Option Agreement duly recorded in the land records of Berlin, NH, PSNH also has an exclusive, irrevocable, first priority option to purchase the Facility and all other real, personal and intangible property associated with the Facility and its operations, free of all other interests, at the end of the 20-year PPA term.

### Limitations on Amendments to the PPA

36.   Section 26.7 of the PPA provides: "No amendment of all or any part of this Agreement shall be valid unless it is reduced to writing and signed by both Parties and, in the case of a material amendment, approved by the NHPUC."

37.   Section 24.2 of the PPA provides: "It is the intention of the Parties that any authority of FERC or the NHPUC to change this Agreement shall be strictly limited to that authority which applies when the Parties have irrevocably waived their right to

seek to have FERC or the NHPUC change any term of this

Agreement."

    38.   Section 24.3 of the PPA provides as follows:

> 24.3.1 Absent the agreement of all Parties to a
> proposed change, the standard of review for
> changes to any section of this Agreement
> specifying the pricing or other material economic
> terms and conditions agreed to by the Parties
> herein, whether proposed by a Party, a non-party
> or FERC acting sua sponte, shall solely be the
> "public interest" application of the "just and
> reasonable" standard of review set forth in
> *United Gas Pipe Line Co. v. Mobile Gas Service
> Corp.*, 350 U.S. 332 (1956) and *Federal Power
> Commission v. Sierra Pacific Power Co.*, 350 U.S.
> 348 (1956) and clarified by *Morgan Stanley
> Capital Group, Inc. v. Public Util. Dist. No. 1
> of Snohomish*, 128 S.Ct. 2733 (June 26, 2008) (the
> "*Mobile-Sierra*" doctrine).

> 24.3.2 The Parties, for themselves and their
> successors and assigns, (i) agree that the
> "public interest" standard of review shall apply
> to any proposed changes in any other documents,
> instruments or other agreements executed or
> entered into by the Parties in connection with
> this Agreement, and (ii) hereby expressly and
> irrevocably waive any rights they can or may have
> to the application of any other standard of
> review, including the "just and reasonable"
> standard.

> 24.3.3 Notwithstanding the foregoing Sections
> 24.3.1 and 24.3.2, to the fullest extent
> permitted by applicable law, each Party, for
> itself and its successors and assigns, hereby
> also expressly and irrevocably waives any rights
> it can or may have, now or in the future, whether
> under §§ 205 and/or 206 of the Federal Power Act
> or otherwise, to seek to obtain from FERC, or to
> support another in obtaining, by any means,
> directly or indirectly (through complaint,
> investigation or otherwise), and each hereby
> covenants and agrees not at any time to seek to

17

so obtain, or support another in obtaining, an
order from FERC changing any section of this
Agreement specifying the pricing, charges,
classifications or other economic terms and
conditions agreed to by the Parties. It is the
express intent of the Parties that, to the
fullest extent permitted by applicable law, the
"sanctity of contract" principles acknowledged by
FERC in its Notice of Proposed Policy Statement
(issued August 1, 2002) in Docket No. PL02-7-000,
Standard of Review for Proposed Changes to
Market-Based Rate Contracts for Wholesale Sales
of Electric Energy by Public Utilities, shall
prevail, notwithstanding any changes in
applicable law or markets that may occur. In the
event it were to be finally determined that
applicable law precludes one or both Parties from
waiving its rights to seek changes from FERC to
its market-based power sales contracts (including
entering into covenants not to do so) then this
Section 24.3.3 shall not apply, provided that,
consistent with Section 24.3.1, neither Party
shall seek any such changes except under the
"public interest" standard of review and
otherwise as set forth in Section 24.3.1.

### Governing Law and Venue Provisions in PPA

39.   Section 22.1 of the PPA provides that interpretation
and performance of the PPA shall be in accordance with and
controlled by the laws of the State of New Hampshire (other than
any conflicts of law provision), among other applicable local,
state and federal laws, regulations and bodies having
jurisdiction over the matters therein.

40.   Section 22.2 of the PPA, concerning venue, provides:

Subject to Article 25, Dispute Resolution, any
dispute arising out of this Agreement shall be
brought in a court of competent jurisdiction
located in Manchester in the State of New
Hampshire. Each Party irrevocably waives any

18

objection which it may have to the venue of any
proceeding brought in any such court and waives
any claim that such proceedings have been brought
in an inconvenient forum.

## Debtors' Purported Termination of PPA

41.  By correspondence dated January 23, 2024, the Debtors
notified PSNH of a purported default of the PPA for an alleged
failure to pay amounts owing thereunder, which default PSNH
disputes.  After subsequent correspondence in which PSNH
demanded that the parties seek to resolve the resulting billing
dispute pursuant to Articles 10.5 (concerning billing disputes)
and 25.1 (concerning negotiation between executives for dispute
resolution) of the PPA, by correspondence dated February 8,
2024, the Debtors purported to: (a) terminate the PPA, (b)
terminate PSNH as Lead Market Participant, and (c) terminate the
Purchase Option Agreement and Purchase Option, all effective as
of February 8, 2024, i.e., the day immediately prior to filing
these bankruptcy cases.  PSNH disputes any default on its part
and disputes the effectiveness of the foregoing purported
terminations.  Moreover, the Debtors filing for bankruptcy
petition is a default under Section 12.1.4 of the PPA.

## Cate Street Capital Bankruptcy Proceedings

42.  Cate Street Capital, the original project manager for
the construction of the Facility for Berlin Station, ceased
operations in 2018, and on May 12, 2020, Cate Street Capital

filed a chapter 7 bankruptcy case in the NH Bankruptcy Court, Case No. 20-10506-BAH (the "Cate Street Bankruptcy Case"), which proceedings are still pending.

43.  There are over 300 entries on the Cate Street Bankruptcy Case docket (excluding docket entries in the various adversary proceedings filed in that case).  Debtor Berlin Station, as well as CS Ops, each appeared as creditors in the Cate Street Bankruptcy Case.  CS Ops is the assignee of the Project Management Agreement to operate the Facility.

44.  As the original counterparty to the Project Management Agreement, Cate Street Capital managed and operated the Facility through March 1, 2018, at which time the Project Management Agreement was assigned to Debtor CS Ops.

45.  There is an adversary proceeding currently pending in the Cate Street Bankruptcy Case [Adv. Pro. No. 21-01017], which was filed by the chapter 7 trustee against Berlin Station, CS Ops, and various current and/or former directors, officers and/or other personnel of those entities (including Robert Desrosiers, John Halle and others) (collectively, the "AP Defendants").  The adversary proceeding alleges various claims against the AP Defendants in connection with Cate Street Capital's assignment of the Project Management Agreement to CS Ops, purportedly for no consideration, and Cate Street Capital's write-off of millions of dollars of receivables owing from CS

Ops and other affiliated entities.  Those claims include claims
of successor liability and fraudulent transfer against CS Ops;
fraudulent transfer against Debtor Berlin Station; substantive
consolidation and alter ego against all AP Defendants; and
fraud, conspiracy, and breach of fiduciary duty against John
Halle, Robert Desrosiers and other individual AP Defendants.

46.   The chapter 7 trustee, Berlin Station, and CS Ops have
entered into a settlement agreement to resolve all of the Cate
Street Capital bankruptcy estate's clams against Berlin Station
and CS Ops and those entities' claims against the estate.  That
settlement agreement (as subsequently revised) has not yet been
approved by the NH Bankruptcy Court due to objections made by
Cate Street Capital's largest creditor, Xpress Natural Gas, LLC
("Xpress"), which objection resulted in lengthy litigation,
including a two-day hearing before the NH Bankruptcy Court
concerning the claims at issue and the standards for settling
those claims pursuant to Bankruptcy Rule 9019.  During the
course of that litigation, the NH Bankruptcy Court gained in-
depth knowledge, through testimony of Robert Desrosiers, among
others (including expert testimony) and extensive documentary
evidence concerning: (A) the complex corporate, capital and
operating structure of Berlin Station, Burgess, CS Ops, Cate
Street Capital, and various other affiliated project development
entities; (B) the positions and/or interests that various

individuals (including Robert Desrosiers and John Halle) held in
those companies; (C) the complex cash management system and cash
flow waterfall utilized by Berlin Station, Burgess and CS Ops;
(D) the Facility's creditors; (E) the Facility's history; and
(F) the Facility's energy, economic and environmental importance
to the citizens of New Hampshire.

47.   Both Berlin Station and CS Ops have actively
participated in litigation in the Cate Street Bankruptcy Case
and have filed significant contingent claims in that case.

## Additional Connections Among the Debtors, CS Ops, Cate Street Capital, and Other Affiliated Entities

48.   Robert Desrosiers and/or John Halle (or his family
members) have for many years simultaneously held various
positions of Manager, Owner, Director, and Officer of Cate
Street Capital, Berlin Station, Burgess, CS Ops, CSC Group
Holdings, LLC ("CSC Group Holdings") and other
related/affiliated entities, each of which was located at and
operated from the Cate Street Address through at least 2022
(through 2018 for Cate Street Capital, when it ceased
operating), and each of which (except for Cate Street Capital)
currently operates from the Loudon Road Address.

49.   According to Annual Reports filed with the New
Hampshire Department of State:

A.   Robert Desrosiers was the sole Manager of Berlin

Station as of both March 21, 2018 and March 16, 2022.

B.   Robert Desrosiers was the sole Manager of Burgess as of both March 21, 2018 and March 16, 2022.

C.   Robert Desrosiers was Director and President of CS Ops, and John Halle was Director and Secretary of CS Ops, as of both March 21, 2018 and March 16, 2022.

D.   Robert Desrosiers was Vice President, Secretary, Treasurer and Director of Cate Street Capital, and John Halle was President of Cate Street Capital as of March 21, 2018; and Robert Desrosiers had held positions as officer and Director of Cate Street Capital since its inception.

E.   As of May 10, 2023, Jean R. Halle (who upon information and belief is a relative of John Halle) was and currently is the sole Manager of Berlin Station and Burgess.

F.   As of May 31, 2023, Jean R. Halle was and currently is the President and Chairman of the Board of Directors of CS Ops.

50.  According to testimony given by Robert Desrosiers in October 2022 in the Cate Street Bankruptcy Case:

A.   Robert Desrosiers was the Vice President of Compliance for Cate Street Capital from 2009 through 2016; an officer of CS Ops and CS Berlin Ops, Inc. from their inception through July 2022; a director and officer of

Berlin Station through July 2022; the director for Burgess through July 2022; manager of CSC Group Holdings, LLC (an indirect equity investor in Berlin Station) through July 2022; and director, officer and/or manager at a number of affiliated entities through July 2022.

B.   Robert Desrosiers assisted in the completion of and signed, as Director, Cate Street Capital's bankruptcy Schedules and Statement of Financial Affairs.

C.   John Halle is or was the CEO of CS Ops and also has or had a direct or indirect equity interest in Cate Street Capital and potentially other affiliated entities.

D.   Cate Street Capital arranged the financing for Berlin Station and was the project manager for the Facility through March 2018, when the Project Management Agreement was assigned to CS Ops.

E.   John Desrosiers negotiated and signed the Project Management Agreement on behalf of Berlin Station, as its Director, and also negotiated and signed the Project Management Agreement on behalf of Cate Street Capital, as its VP of Compliance.

F.   The Assignment Agreement assigning the Project Management Agreement from Cate Street Capital to CS Ops was signed by John Halle as President of Cate Street Capital and by Robert Desrosiers as Executive Vice President of CS

Ops.

G.   CSC Group Holdings was a direct and/or indirect equity investor in both Berlin Station and Cate Street Capital.

H.   Cate Street Capital provided management services to CSC Group Holdings through approximately 2018 pursuant to a management agreement signed by John Desrosiers as Manager on behalf of CSC Group Holdings and John Halle on behalf of Cate Street Capital.

I.   CS Ops now provides certain incidental management services to CSC Group Holdings.

J.   Prior to filing bankruptcy, Cate Street Capital wrote off millions of dollars of debt owing from CSC Holdings Group and certain related entities.

K.   Cate Street Capital, CSC Holdings Group, CS Ops and Berlin Station, among other entities, are affiliated project development companies. Cate Street Capital would raise capital to invest into various project companies (such as Berlin Station), CSC Holdings Group and other entities would make equity investments in the applicable project, and then Cate Street Capital (and later CS Ops) would enter into a management agreement with the project company.  The equity ownership of each one of the project companies was different, but the affiliated development

companies would expend and cover costs as a team in hopes of making a collective profit for the affiliated development companies.

51.   According to testimony given by the chapter 7 trustee in October 2022 in the Cate Street Bankruptcy Case:

A.   The Project Management Agreement between Cate Street Capital (later assigned to and currently held by CS Ops) and Berlin Station was "the major asset in the [Cate Street Capital bankruptcy] estate."

B.   John Halle and Robert Desrosiers were the principal persons involved in all negotiations, and the signatories on both sides of, all management contracts entered into by Cate Street Capital.

52.   The Statement of Financial Affairs in the Cate Street Bankruptcy Case lists John Halle as a Director of Cate Street Capital at the time of the bankruptcy filing, and a former President and CEO of Cate Street Capital.

53.   On September 24, 2019, the Superior Court of Rockingham County, New Hampshire issued a ruling that CS Ops is a mere continuation of Cate Street Capital. *See* Exhibit K to the *Objection By Xpress Natural Gas LLC To Joint Motion To Approve Settlement* filed in the United States Bankruptcy Court District of New Hampshire in *In re: Cate Street Capital, Inc.,* Case No. 20-10506 attached as **Exhibit 6**.

## Key Witnesses' and Other Interested Parties' Connections to New Hampshire

54.   Upon information and belief, Robert Desrosiers resides in New Hampshire.

55.   Upon information and belief, John Halle resides in Florida, and regularly conducted business in New Hampshire through at least March 2022 in connection with the Facility and CS Ops' management thereof.

56.   Jean R. Halle is listed in New Hampshire public business records with a North Palm Beach, Florida address.   Upon information and belief, Jean R. Halle is related to John Halle and, as the current principal officer and/or manager of each of the Debtors, regularly conducts business in New Hampshire in connection with the Facility.

57.   Upon information and belief, Xpress is headquartered at 30 Rowes Wharf, 6th Floor, Boston, MA 02110, and also maintains an office at 300 Brickstone Sq., Andover, MA 01810.

## DISCUSSION

### I.   Venue Generally

58.   28 U.S.C. § 1408 provides that a bankruptcy case may be commenced in the district court for the district –

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the

one hundred and eighty days immediately preceding
such commencement, or for a longer portion of such
one hundred-and-eighty-day period than the domicile,
residence, or principal place of business, in the
United States, or principal assets in the United
States, of such person were located in any other
district or

(2) in which there is pending a case under title 11
concerning such person's affiliate, general partner,
or partnership.

59.   A corporation is domiciled where it is incorporated.
A corporation's principal place of business is where the
company's headquarters is located, i.e., "where a corporation's
officers direct, control, and coordinate the corporation's
activities" – "sometimes referred to as the 'nerve center' of
the company." *In re Grayson O Co.*, 2023 Bankr. LEXIS 1906, *4
(Bankr. W.D.N.C.) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77,
92-93, 130 S. Ct. 1181, 175 L. Ed. 2d 1029 (2010)).

## II.   Transfer of Venue

60.   28 U.S.C. § 1412 provides:

A district court may transfer a case or proceeding
under title 11 to a district court for another
district, in the interest of justice or for the
convenience of the parties.

61.   Bankruptcy Rule 1014(a) provides:

If a petition is filed in the proper district, the
court, on timely motion of a party in interest or on
its own motion, and after hearing on notice to the
petitioners, the United States trustee, and other
entities as directed by the court, may transfer the
case to any other district if the court determines
that the transfer is in the interest of justice or
for the convenience of the parties.

62.   Thus, even if venue is properly laid in a district, a bankruptcy court may nevertheless transfer venue to another district "in the interest of justice or for the convenience of the parties." *In re LTL Mgmt. LLC*, 2021 Bankr. LEXIS 3173, *7 (Bankr. D.N.J.).  "The moving party bears the burden of showing by a preponderance of the evidence that ***either*** the interests of justice ***or*** the convenience of the parties would be served by a transfer of the case." *Id.* (citations omitted) (emphasis added).

63.   "Ultimately, the decision to transfer venue is within the sound discretion of the court based on a 'case-by-case analysis of the facts underlying each particular case.'" *Id.* (citations omitted); *see also In re Rehoboth Hospitality, LP*, 2011 Bankr. LEXIS 3992 *10 (Bankr. D. Del.) (citing *In re Centennial Coal, Inc.*, 282 B.R. 140, 146 (Bankr. D. Del. 2002)).

**A.   Convenience of the Parties**

64.   Bankruptcy courts generally consider six factors in determining whether to transfer venue for the convenience of the parties, as follows:

> A. The proximity of creditors of every kind to the court;
>
> B. The proximity of the debtor to the court;
>
> C. The proximity of witnesses necessary to the administration of the estate;
>
> D. The location of the assets;

E. The economic administration of the estate; and

F. The necessity for ancillary administration if a
   liquidation should occur.

*See, e.g.,* *In re Enron Corp.*, 274 B.R. 327, 343 (Bankr. S.D.N.Y.
2002) (citing *In re Commonwealth Oil Refining Co.*, 596 F.2d
1239, 1244 (5ᵗʰ Cir. 1979)).  Of these six factors, the economic
and efficient administration of the estate is generally given
the most weight in determining whether to transfer venue. *In re
LTL Mgmt. LLC*, 2021 Bankr. LEXIS 3173, *8 (citation omitted);
*see also In re Grayson O Co.,* 2023 Bankr. LEXIS 1906, *10
(citations omitted).

**B.    Interest of Justice**

65.  "The interest of justice standard is a 'broad and
flexible standard that is applied based on the facts and
circumstances of each case.'"  *In re LTL Mgmt. LLC*, 2021 Bankr.
LEXIS 3173, *15 (quoting *In re Enron Corp.*, 284 B.R. 376, 403
(Bankr. S.D.N.Y. 2002)).  Generally, in evaluating this
standard, bankruptcy courts consider whether a transfer of venue
would promote "the efficient administration of the bankruptcy
estate, judicial economy, timeliness and fairness."  *Id.*
(quoting *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1391
(2d Cir. 1990)).  "As a practical matter…if the convenience of
the parties and witnesses will be served by a transfer, it
usually follows that justice will also be served by a transfer."

*Id.* (quoting *In re Pinehaven Assoc.*, 132 B.R. 982, 990 (Bankr. E.D.N.Y. 1991)); *see also In re Grayson O Co.,* 2023 Bankr. LEXIS 1906, *13 (citations omitted).

**C.    Delaware Bankruptcy Court's Formulation of Test**

66.    The Delaware Bankruptcy Court has articulated and applied a slightly different, but similar, eight-factor test in determining whether to transfer venue, as follows:

(1) the location of the plaintiff and defendant (i.e., where the debtor operates and where secured and unsecured creditors are located);

(2) the ease of access to the necessary proof (i.e., where witnesses and books and records are located);

(3) the availability of subpoena power for the unwilling witnesses;

(4) the expense related to obtaining willing witnesses;

(5) the enforceability of any judgment rendered;

(6) the ability to receive a fair trial;

(7) the state's interest in having local controversies decided within its borders; and

(8) the economics of the estate administration.

*See generally In re Rehoboth Hospitality, LP*, 2011 Bankr. LEXIS 3992, *11; *In re Borden Chem.'s and Plastics Operating Limited P'ship*, 2004 Bankr. LEXIS 1251, 2004 WL 1887532, *2 (Bankr. D. Del. 2004) (citing *Hechinger Inv. Co. of Del. v. M.G.H. Home*

*Improvement, Inc.*, 288 B.R. 398, 402-03 (Bankr. D. Del. 2003));
*Continental Airlines Inc. v. Chrysler*, 133 B.R. 585, 587-88
(Bankr. D. Del. 1991).

67.   In *In re Innovative Communication Co., LLC*, 358 B.R.
120, 126-28 (Bankr. D. Del. 2006), as clarified on denial of
reconsideration, 2007 Bankr. LEXIS 520 (Bankr. D. Del. Feb. 13,
2007), the Delaware court transferred venue to the Virgin
Islands after considering a slightly different set of factors
including forum preference, where the claim arose, convenience
of witnesses, location of books and records, relative
administrative difficulty, local interest and public policies,
and familiarity with applicable state law.

68.   As to factor number (7) above, the *Rehoboth* court
found that the future of the debtor's single asset, a hotel, was
of primary importance to the community in which the hotel was
located (Texas) and that the central issue in the case was
likely to be the value of that single asset. Accordingly, the
Texas court, with its local knowledge of the property, locale
and real estate values, was better situated to determine an
appropriate valuation based on the local valuation expert's
testimony.  *In re Rehoboth Hospitality, LP*, 2011 Bankr. LEXIS
3992, *14-15.

69.   As to factor number (8) above, the *Rehoboth* court
found that in the context of what is essentially a single asset

case, the location of the lone improved real estate asset is of particular concern to the court, especially in the event of a potential liquidation, and thus the case is better administered by a court in the district in which it is located, which has more familiarity with the local real estate market and application of Texas real property law. *In re Rehoboth Hospitality, LP*, 2011 Bankr. LEXIS 3992, *15-16.

**III. Both the Convenience of the Parties and the Interest of Justice Weigh Overwhelmingly in Favor of Transferring Venue of These Bankruptcy Proceedings to the NH Bankruptcy Court.**

**A. Location of the Debtors, Creditors and Other Interested Parties**

70. The Facility, which is Berlin Station's sole asset and the sole asset operated by Burgess, is located in New Hampshire, operates exclusively in New Hampshire, and its products are sold exclusively in New Hampshire. Further, as in the *Rehoboth* case, a central issue in the case is likely to be the value of the Facility.

72. The principal place of business for each of Berlin Station and Burgess is located in New Hampshire.

73. PSNH, the Facility's exclusive customer and its sole creditor (other than its secured lenders), is located and operates exclusively in New Hampshire.

74.   The Facility's primary supplier, Richard Trucking, is located and operates in New Hampshire and Maine (which is far closer to New Hampshire than Delaware).

75.   Deutsche Bank, the collateral agent for the Debtors' secured lenders, is located in New York, which does not favor either Delaware or New Hampshire.

76.   The Facility's employees, which are supplied by CS Ops, presumably reside in or very near New Hampshire.  In any event, they regularly conduct business in New Hampshire in connection with the Facility.

77.   Jean R. Halle, listed as the current managing member of Berlin Station and Burgess (as well as CS Ops), resides in Florida, which does not favor Delaware or New Hampshire, as plane travel would be required to either location.

78.   Xpress, which is likely to be an active constituent in the Debtors' bankruptcy proceedings, is headquartered in Boston, Massachusetts and maintains an office in Andover, Maine, both of which are far closer to New Hampshire than Delaware.

79.   The Debtors do not have any creditors located in Delaware, as the Debtors do not conduct any business there. In fact, the Debtors admit in their list of Top 20 Creditors their only unsecured creditor is PSNH.

80.   Further, as the NHPUC regulates the operation of the Facility and the PPA, it is likely to be an active participant

in the Debtors' bankruptcy proceedings.  Not only does the NHPUC have jurisdiction over issues impacting the PPA, the Facility, and corresponding rates charged by PSNH to its customers, but the NHPUC is currently actively exercising that jurisdiction in connection with the PSNH Petition to adjust its SCRC based in part on anticipated recoupment of the Excess Cumulative Reduction under the PPA.

81.  As set forth in the *Burgess BioPower, LLC Bi-Annual Report Required by Public Utilities Commission Order 26,333* (the "May 2022 Report"), which is attached as **Exhibit 7**:

> In addition to its important economic and energy impact statewide, Burgess contributes significantly to the local Berlin economy through its payments-in-lieu-of-taxes ("PILOT") agreement with the City of Berlin:
>
> .    Burgess accounts for **25% of annual water fees** and **10% of annual sewer fees**
>
> .    Burgess pays **12% of the city's total annual taxes**
> .    Burgess has contributed nearly **$1.2 million to the City of Berlin** in just two years from the sale of Renewable Energy Certificates ("RECs")
>
> .    A third payment is anticipated for the summer of 2022
>
> .    Closure could place the **City of Berlin into receivership**

82.  Thus, while the Debtors are undisputedly Delaware entities, none of their assets, operations, creditors, or other interested parties are in Delaware.  As one bankruptcy court

explained in a similar venue dispute between Massachusetts and

Delaware:

> [T]he Debtor's contacts with Delaware are
> minimal…. Other than the Debtor being
> incorporated there…there is no other apparent
> connection to Delaware…. The Debtor's contacts
> with Massachusetts are substantial, more so than
> any other place in the World.  The Debtor's
> operations are here; its assets are here; its
> current and former employees are here; and its
> management is here.  Many of its creditors
> (measured in both numbers of creditors and the
> amounts owed to them) are here, too, notably from
> the list of the 30 largest unsecured creditors….
> Clearly, the Debtor's venue selection was not
> based on the convenience of these constituencies
> given their geographic connection to
> Massachusetts.

*In re Malden Mills Indus., Inc.*, 361 B.R. 1, 10 (Bankr. D.

Mass. 2007).  Similarly in this case, the Debtors' contacts

with Delaware are minimal, while their contacts with New

Hampshire "are substantial, more so than any other place in

the World."  In recognition of this fact, the Debtors

expressly agreed and waived all objections to venue being

placed in New Hampshire courts for all disputes arising out

of the PPA, the terms of which prompted these bankruptcy

proceedings and will be a major, if not the primary, focus

of these bankruptcy proceedings.

83.  Further, under remarkably similar facts to those

at issue in these proceedings, this Court transferred venue

of a related debtor[4] paper-mill operator's bankruptcy case
from the Delaware bankruptcy court to the U.S. Bankruptcy
Court for the District of Maine.  *See In re GNP Maine
Holdings, LLC,* Case No. 14-12179, Docket Nos. 10 and 43
(Hon. Mary F. Walrath), copies of which are attached as
**Exhibit 8**.  In the *GNP Maine Holdings* case: (A) more than
56% of the debtor's creditors were in Maine, while less
than 1% were in Delaware; (b) all of the debtor's assets
and operations were in Maine; (c) most relevant witnesses
necessary to administration of the estate, including the
debtor's current and former employees and managers, resided
in Maine; (d) the Maine court was already familiar with the
history, operations and constituencies involved, having
presided over a previously-filed bankruptcy case involving
the same mill assets, which bankruptcy was still pending
when the *GNP Maine Holdings* bankruptcy was filed, providing
the Maine court with greater efficiency in resolving the
case; and (e) there was substantial public interest in
having issues concerning the mill and their effects on
Maine citizens resolved by the Maine bankruptcy court.

---

[4] Upon information and belief, Cate Street Capital, Robert Desrosiers,
John Halle, and other insiders and affiliates of the Debtors were also
involved in the development, funding, management and operation of GNP
Maine Holdings, LLC and its facility.

84.   Accordingly, this factor weighs heavily in favor of transferring venue of these Bankruptcy Proceedings to the NH Bankruptcy Court.

**B.   Ease of Access to Necessary Proof**

85.   As the Facility and the Debtors' principal place of business are located in New Hampshire, the Debtors' books and records and the vast majority of their current and former personnel with relevant information necessary to the administration of the estate, including but not limited to Robert Desrosiers and John Halle, either reside in New Hampshire or regularly conduct business in New Hampshire.

86.   As the Debtors do not conduct any business in Delaware, it is unlikely that any records or witnesses necessary to the administration of the estate are located in Delaware.

87.   Accordingly, this factor weighs strongly in favor of a transfer of these bankruptcy proceedings to the NH Bankruptcy Court.

**C.   Availability of Subpoena Power and Expense of Obtaining Unwilling Witnesses**

88.   As the vast majority of the Debtors' (current and former) personnel and creditors reside in or regularly conduct business in New Hampshire, and presumably few if any witnesses are located in Delaware, many necessary witnesses are likely beyond this Court's subpoena power.  Even if such witnesses are

willing to voluntarily appear in Delaware to participate in these proceedings, the travel costs alone would impose a significant expense on the estate.   Thus, these factors weigh heavily in favor of transferring the Debtors' bankruptcy proceedings to the NH Bankruptcy Court.

**D.    State's Interest in Having Local Controversies Decided Within Its Borders**

89.   The New Hampshire legislature has made express, documented findings that the operation of the Facility is important to: the state's energy infrastructure; the regional fuel security and reliability of the regional electricity grid; the state's attainment of renewable energy portfolio standard goals of fuel diversity, capacity, sustainability and energy independence; the continued health of the state's forests; the state's timber industry; and employment and the economy of both the North Country and the state as a whole.

90.   The Debtors have admitted the importance of the Facility to local and state governments in New Hampshire in the May 2022 Report attached as Exhibit 3.

91.   Further, as PSNH recovers the full cost of the rates, terms and conditions of the PPA to PSNH through the rates that it charges its electric utility customers, all of whom are located in New Hampshire, the operation of the Facility and the effect of the Excess Cumulative Reduction on electric utility

rates is of great interest to the citizens and businesses of New Hampshire and to the NHPUC, which regulates those rates.

92.  Moreover, the NHPUC regulates PSNH and the PPA pursuant to which PSNH purchases the products of the Facility, and is actively exercising that jurisdiction in connection with the recent PSNH petition to adjust its SCRC.  Accordingly, the NHPUC is likely to be an active participant in the Debtors' bankruptcy proceedings.

93.  Accordingly, this factor weighs strongly in favor of transferring venue of these bankruptcy proceedings to the NH Bankruptcy Court.

**E.   Economics of Estate Administration**

94.  As set forth above, the Facility is located in and operates exclusively in New Hampshire and sells its products exclusively in New Hampshire.  Further, the sole creditor, (current and former) personnel, and other interested parties of the Debtors are located in New Hampshire.  In addition, witnesses and records necessary to the administration of the estate are located primarily, if not exclusively, in New Hampshire.  Whereas, no creditors, and few if any records or witnesses, are located in Delaware.

95.  Moreover, the Cate Street Bankruptcy Case, which involves a company affiliated with the Debtors that managed the day-to-day operations of the Facility until March of 2018, has

been pending in the NH Bankruptcy Court for over three years.
Cate Street Capital was managed and operated by the same
directors and officers (including Mr. Desrosiers and Mr. Halle)
that managed and operated the Debtors and other related entities
until just last year, when such management was taken over by a
family member of Mr. Halle.  Further, Berlin Station, CS Ops,
and Mr. Desrosiers, among other current or former personnel of
the Debtors, have actively participated in Cate Street Capital's
bankruptcy proceedings.  Through the numerous pleadings filed,
extensive testimony and evidence presented, and hearings held in
the Cate Street Bankruptcy Case (including a two-day hearing
with testimony from Mr. Desrosiers and an expert witness, among
others), the NH Bankruptcy Court has already gained in-depth
knowledge concerning (A) the complex corporate, capital and
operating structure of Berlin Station, Burgess, CS Ops, and
affiliated development entities; (B) the positions and/or
interests that various individuals (including Robert Desrosiers
and John Halle) held in those companies; (C) the complex cash
management system and cash flow waterfall utilized by Berlin
Station, Burgess and CS Ops; (D) the Facility's creditors; (E)
the Facility's history; and (F) the Facility's economic and
environmental importance to the citizens of New Hampshire, as
well as its importance to the state's energy infrastructure,
diversity and independence.  Further, Xpress, which was actively

41

involved in the Cate Street Bankruptcy Case, is extremely likely

to be actively involved in the Debtors' bankruptcy proceedings

given the positions taken in that case concerning Berlin Station

and CS Ops, among other debtor-affiliated entities, being alter

egos of Cate Street Capital and/or recipients of fraudulent

conveyances.

96.   Accordingly, it is overwhelmingly clear that both

judicial economy and the efficient and economic administration

of the Debtors' bankruptcy estates strongly favor transferring

these proceedings to the NH Bankruptcy Court.

### F.    Enforceability of Judgments Rendered and Ability to Receive a Fair Trial

97.   The last two factors – enforceability of judgments

rendered and the ability to receive a fair trial – are neutral,

as there is no reason to believe that judgments and orders

entered by either the Delaware Bankruptcy Court or the NH

Bankruptcy Court would not be given full faith and credit by

other courts or that any parties in interest would be unable to

obtain a fair trial in either court.

98.   Based on all of the foregoing, it is clear that a

transfer of the Debtors' bankruptcy cases to the NH Bankruptcy

Court is appropriate, as it would overwhelmingly serve both the

convenience of the vast majority of interested parties and the

interest of justice within the meaning of 28 U.S.C. § 1412.

WHEREFORE, for all of the foregoing reasons, PSNH respectfully requests that the Court promptly transfer venue of the Debtors' jointly administered bankruptcy cases to the NH Bankruptcy Court, and provide such other and further relief as the Court deems just and appropriate.

Dated: February 12, 2024

WHITEFORD, TAYLOR & PRESTON LLC

By: /s/ *William F. Taylor, Jr.*
William F. Taylor, Jr. (DE#2936)
Richard W. Riley (DE#4052)
600 North King Street
Suite 300
Wilmington, Delaware 19801
Telephone: (302) 357-3265
Facsimile: (302) 357-3286
E-mail: wtaylor@whitefordlaw.com
        rriley@whitefordlaw.com


and


LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
(*Pro Hac Vice* Pending)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
E-mail: russell@russelljohnsonlawfirm.com
        john@russelljohnsonlawfirm.com

*Counsel to Public Service Company of New Hampshire*